819 A.2d 410

SPAULDING COMPOSITES COMPANY, INC., PLAINTIFF, AND CALDWELL TRUCKING PRP GROUP, INTERESTED PARTY–APPELLANT, v. AETNA CASUALTY AND SURETY COMPANY, ALLSTATE INSURANCE COMPANY, AS SUCCESSOR TO NORTHBROOK INSURANCE COMPANY, AMERICAN CENTENNIAL INSURANCE COMPANY, AMERICAN HOME INSURANCE COMPANY, EMPLOYERS INSURANCE OF WAUSAU, GREENWICH INSURANCE COMPANY, AS SUCCESSOR TO HARBOR INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, CERTAIN LONDON MARKET COMPANIES, NEW ENGLAND REINSURANCE CORPORATION, NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION AND JOHN DOE IN-

SURANCE COMPANIES 1 THROUGH 50, DEFENDANTS, AND INDUSTRIAL UNDERWRITERS INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, DEFENDANTS–RESPONDENTS.

Argued September 24, 2002—Decided April 10, 2003.

*Peter J. Herzberg,* argued the cause for appellant (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Mr. Herzberg* and *Kathy Dutton Helmer,* on the brief).

*John C. Sullivan,* argued the cause for respondent Liberty Mutual Insurance Company (*Klett Rooney Lieber & Schorling* and *Post & Schell,* attorneys; *Thomas B. O'Brien, Jr.* and *Joseph B. Silverstein,* on the briefs).

*Martin P. Lavelle,* argued the cause for respondents National Union Fire Insurance Company of Pittsburgh, PA, and Lexington Insurance Company.

*Jerrald J. Hochman,* argued the cause for respondent Industrial Underwriters Insurance Company (*Siegal & Napierkowski,* attorneys).

*Gita F. Rothschild,* submitted a brief on behalf of *amici curiae* G.A.F. Materials Corporation, R & F Alloy Wire and N.J.C. Holdings, Inc. (*McCarter & English,* attorneys; *Alissa Pyrich* and *Gregory H. Horowitz,* on the brief).

*Wendy L. Mager,* submitted a brief on behalf of *amicus curiae* Complex Insurance Claims Litigation Association (*Smith, Stratton, Wise, Heher & Brennan,* attorneys).

The opinion of the Court was delivered by

LONG, J.

In this appeal, we revisit the "continuous trigger" and "pro rata allocation" doctrines we adopted to address complex environmental insurance coverage issues in *Owens–Illinois, Inc. v. United Ins. Co.,* 138 *N.J.* 437, 650 *A.*2d 974 (1994). More particularly, we have been asked how those principles affect the validity of a "non-cumulation" clause in a comprehensive general liability policy that is invoked by an insurer to restrict its exposure on nine years of coverage to a single policy limit. We hold that the rules enunciated in *Owens–Illinois* and reaffirmed in *Carter–Wallace, Inc. v. Admiral Ins. Co.,* 154 *N.J.* 312, 712 *A.*2d 1116 (1998) preclude enforcing such a limitation.

I

The facts of the case are detailed in the decision of the Appellate Division and are incorporated herein as if more fully set forth. 346 *N.J.Super.* 167, 787 *A.*2d 238 (2001). We recite only those necessary to our disposition.

Spaulding Composites Company, Inc. (Spaulding) purchased $678 million in comprehensive general liability (CGL) insurance between 1967 and 1984. Nine of those policies were issued by Liberty Mutual Insurance Company (Liberty) during the period from 1976 to 1984. The 1976 policy had a $500,000 limit and the other eight each had a $1 million limit. During those nine years in which Liberty was Spaulding's primary insurer, Spaulding also

purchased excess liability in amounts varying from $23 million to $100 million.

Each of Liberty's nine CGL policies contained the identical non-cumulation clause that provided:

PERSONAL INJURY LIABILITY AND PROPERTY DAMAGE LIABILITY

(A) The limit of liability stated in the schedule as applicable to 'each *occurrence*' is the total limit of the company's liability for all damages because of *personal injury* or *property damage* as a result of any one occurrence.

. . . .

(C) For the purpose of determining the limit of the company's liability, all *personal injury* and *property damage* arising out of continuous or repeated exposure to substantially the same general conditions shall be construed as arising out of one occurrence.

(D) If the same occurrence gives rise to *personal injury* or *property damage* which occurs partly before and partly within the policy period, the '*each occurrence*' limit and the applicable aggregate limit of this policy shall be reduced by the amount of each payment made by the company with respect to such *occurrence* under a previous policy of which this policy is a replacement.

[(Emphasis added).]

In 1990, the United States Environmental Protection Agency (EPA) identified Spaulding as a potentially responsible party for disposing of hazardous lead-containing wastes at the Caldwell Trucking Company Superfund Site in Fairfield Township, New Jersey. In 1993, Spaulding declared bankruptcy. In 1994, Caldwell Trucking PRP Group (PRP) and the EPA each filed suit against Spaulding in the United States District Court alleging that Spaulding was responsible for cleanup costs at the Caldwell Trucking Superfund site. PRP initially joined Spaulding and its insurers, including Liberty, as direct defendants in the federal court suit seeking contribution to cover past and future costs of cleaning up the site. The district court dismissed PRP's claims against Liberty and the excess insurers on the ground that PRP did not have a right to bring a direct cause of action against the insurers. *Caldwell Trucking PRP Group v. Spaulding Composites Co.*, 890 *F.Supp.* 1247, 1256 (D.N.J.1995).

PRP's federal action against Spaulding continued, and in 1996 the district court granted PRP partial summary judgment on the issue of Spaulding's liability for an undetermined amount of the

costs incurred by PRP to clean up the Caldwell Trucking Superfund site. *Caldwell Trucking PRP Group v. Spaulding Composites Co.*, Civ. No. 94–3531, 1996 *WL* 608490, at *14 (D.N.J. Apr.22, 1996). The lone issue that remained in the federal litigation was the amount of damages owed by Spaulding to PRP and the EPA for the site cleanup. In 1999, the district court ordered Spaulding, Liberty, the EPA, and PRP into mediation to decide the amount of coverage Liberty would provide under the CGL policies. That effort proved unsuccessful and was abandoned in late 1999. We were informed at oral argument that judgments of liability have been entered against Spaulding in favor of PRP and the EPA totaling over $13 million, and the matter is now before the Third Circuit Court of Appeals.

In the interim, in 1995, Spaulding began this state court action seeking a declaratory judgment regarding insurance coverage in respect of its share of the defense and remediation costs at the Caldwell Trucking Superfund site. Spaulding moved for summary judgment against its insurers, including Liberty. PRP joined in the motion, which the trial court granted. In ruling, the trial court recognized that *Owens–Illinois* had adopted the continuous trigger theory warranting the treatment of sequential environmental damage as a separate occurrence "within each of the years of a CGL policy." (quoting *Owens–Illinois, supra,* 138 *N.J.* at 478, 650 *A.*2d 974). Because the non-cumulation clause is intended to govern cases involving a single occurrence causing damage over multiple years, the trial court held it to be "inapplicable as a matter of law."

The Appellate Division granted Liberty's motion for leave to appeal and reversed the summary judgment in favor of Spaulding and PRP, declaring the non-cumulation clause both clear and effective. *Spaulding Composites Co. v. Liberty Mut. Ins. Co.*, 346 *N.J.Super.* 167, 171, 787 *A.*2d 238 (2001). In so doing, the panel distinguished *Owens–Illinois* and *Carter–Wallace* on the basis that the CGL policies at issue in those cases were ambiguous. In effect, the panel held that *Owens–Illinois* and *Carter–Wallace*

merely provided an interpretative rationale in cases involving unclear insurance contract language. *Spaulding Composites, supra,* 346 *N.J.Super.* at 178, 787 *A.*2d 238. The court also rejected Spaulding's argument that the non-cumulation clause is an invalid "other-insurance" or "escape" clause and remanded the matter for the entry of partial summary judgment in favor of Liberty. *Id.* at 179–80, 787 *A.*2d 238.

Spaulding and PRP moved for leave to appeal. Several industrial insureds including GAF, R&F Alloy Wire, and NJC Holdings (collectively, the GAF *amici*) were granted leave to appear as *amicus curiae,* as was the Complex Insurance Claims Litigation Association. The excess carriers filed protective answers to the motion for leave to appeal, taking no position concerning the enforceability and applicability of the non-cumulation clauses but seeking to preserve their rights to challenge PRP's characterization of their liability in this action if the court, *sua sponte,* considered the issue of allocation, which had not been raised below and was not determined by the trial court. In 2002, Spaulding assigned all of its rights to coverage from Liberty and its excess insurers to PRP. We granted PRP's motion for leave to appeal on March 19, 2002, *Spaulding Composites Co. v. Liberty Mut. Ins. Co.,* 171 *N.J.* 439, 794 *A.*2d 178 (2002), and now reverse.

II

To understand the issue in this case, *Owens–Illinois* and *Carter–Wallace* require explication.

A.

From 1948 to 1958, Owens–Illinois was the manufacturer of asbestos products including "Kaylo." *Owens–Illinois, supra,* 138 *N.J.* at 442–43, 650 *A.*2d 974. Many plaintiffs filed lawsuits against the company alleging personal injury and property damage arising out of the use of Kaylo. *Id.* at 444, 650 *A.*2d 974.

Over the years, the company maintained substantial CGL coverage in primary and excess layers. *Id.* at 443–44, 650 *A.*2d 974. CGL policies provide coverage to third persons who suffer bodily injury or property damage. Unlike claims or suits that are presented on a date certain and unlike most corporate conduct that generally also may be confined to a single policy period, the bodily injury or property damage against which the CGL policy protects may be sustained by the claimant over an extended period of time. Donald C. Erickson, *Emerging Primary and Excess Coverage Issues in Continuous Trigger Regimes,* 28 *Brief* 18, 18 (Summer 1999). A coverage dispute arose between the company and its insurers. *Owens–Illinois, supra,* 138 *N.J.* at 444–45, 650 *A.*2d 974. More particularly, the issue was which of the insurance policies in effect from 1977 to 1985 provided indemnity to Owens–Illinois and in what amount. *Id.* at 446, 650 *A.*2d 974. Two aspects of the dispute required resolution: the first was the trigger for coverage; the second, allocation among triggered policies. *Id.* at 441, 650 *A.*2d 974.

The CGL policies at issue in *Owens–Illinois* provided coverage for property damage or bodily injury that "occurs" during the policy period. *Id.* at 447, 650 *A.*2d 974. We found no ambiguity in the language of the occurrence clause. "The words are all familiar and easily understandable." *Id.* at 457, 650 *A.*2d 974. Nevertheless, we recognized that resort to policy language and traditional rules of insurance contract interpretation would be inadequate to the task of answering when an occurrence takes place in an environmental exposure case.

Our concepts of legal causation were developed in an age of Newtonian physics, not of molecular biology. Were it possible to know when a toxic substance clicks on a switch that alters irrevocably the composition of the body and before which no change has occurred, we might be more confident that occurrence-causing damages had taken place during a particular policy period. The limitations of science in that respect only compound the limitations of law.

Mass-exposure toxic-tort cases have simply exceeded the capacity of conventional models of judicial response.

The overwhelming conclusion of the commentators who have evaluated the result is that ... common-law tort doctrines are ill-suited to the resolution of such injury claims, and that some form of statutorily-authorized compensation

procedure is required if the injuries sustained by victims of chemical contamination are to be fairly redressed.

No such procedure has been forthcoming. Hence, courts must adapt common-law doctrines to the peculiar characteristics of toxic-tort litigation.

[*Id.* at 458–59, 650 *A.*2d 974 (internal citations and quotation marks omitted).]

We went on to evaluate various theories potentially applicable to an environmental claim including the exposure theory[1], the manifestation theory[2] and the continuous trigger theory, among others. *Id.* at 449–51, 650 *A.*2d 974.

 Ultimately, we abandoned as "hopeless" the task of attempting to define the particular point that is the occurrence in the long-tail injury process. Rebecca M. Bratspies, *Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies*, 1999 *BYU L.Rev.* 1215, 1230 (1999). Taking our cue from the seminal decision of *Keene Corp. v. Insurance Co. of N. Am.*, 667 *F.*2d 1034, 1045–46 (D.C.Cir.1981) (holding that because asbestos-related disease develops slowly, date of occurrence should be continuous period from exposure to manifestation), *cert. denied*, 455 *U.S.* 1007, 102 *S.Ct.* 1644, 71 *L.Ed.*2d 875 (1982), we adopted the continuous trigger theory that states:

[W]hen progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy. That is the continuous-trigger theory for activating the insurers' obligation to respond under the policies.

[*Owens–Illinois, supra,* 138 *N.J.* at 478–79, 650 *A.*2d 974.]

---

[1] The exposure theory holds that the date of occurrence is that on which the injury-producing agent first contacts the body. *Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 633 *F.*2d 1212, 1217 (6th Cir.1980), *clarified on reh'g*, 657 *F.*2d 814 (6th Cir.), *cert. denied*, 454 *U.S.* 1109, 102 *S.Ct.* 686, 70 *L.Ed.*2d 650 (1981).

[2] The manifestation theory provides that injury resulting from environmental exposure does not occur until the disease manifests itself. *Eagle–Picher Indus. v. Liberty Mut. Ins. Co.*, 682 *F.*2d 12, 16 (1st Cir.1982), *cert. denied*, 460 *U.S.* 1028, 103 *S.Ct.* 1279, 75 *L.Ed.*2d 500 (1983).

In so doing, we joined a growing number of states that have adopted the continuous trigger theory.[3]

---

[3] *See Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 *F.*3d 672, 689–90 (6th Cir.2000) (predicting that Ohio Supreme Court would adopt flexible "continuing injury" trigger, which creates rebuttable presumption that all policies in effect from exposure to manifestation triggered); *Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 *F.Supp.*2d 1340, 1349 (N.D.Ga.2001) (concluding that where contract defines "occurrence" as including "continuous or repeated exposure" appropriate trigger is continuous); *GenCorp, Inc. v. AIU Ins. Co.*, 104 *F.Supp.*2d 740, 749 (N.D.Ohio 2000) (holding continuous trigger applicable when environmental contamination claimant is able to show damage, like asbestosis, occurred on continuing basis); *Harleysville Mut. Ins. Co. v. Sussex County, Del.*, 831 *F.Supp.* 1111, 1124 (D.Del.1993) (applying Delaware law finding "slow leaching of pollutants from a landfill to adjacent property" constitutes progressive injury requiring use of continuous trigger theory), *aff'd,* 46 *F.*3d 1116 (3d Cir.1994); *Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 742 *F.Supp.* 571, 573 (D.Colo.1989) (adopting continuous trigger method and finding each policy issued during period that damage occurred was triggered), *rev'd on o.g.*, 954 *F.*2d 601 (10th Cir.), *cert. denied,* 506 *U.S.* 865, 113 *S.Ct.* 189, 121 *L.Ed.*2d 133 (1992); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.*, 662 *F.Supp.* 71, 76 (E.D.Mich.1987) (recognizing similarity between asbestos claims and hazardous waste claims and holding that continuous trigger theory implicates "each exposure of the environment to a pollutant"); *Keene Corp. v. Insurance Co. of N. Am.*, 667 *F.*2d 1034, 1045–46 (D.C.Cir.1981) (holding that because asbestos-related disease develops slowly, date of occurrence should be continuous period from exposure to manifestation), *cert. denied,* 455 *U.S.* 1007, 102 *S.Ct.* 1644, 71 *L.Ed.*2d 875 (1982); *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 *Cal.*4th 645, 42 *Cal.Rptr.*2d 324, 913 *P.*2d 878, 880 (1995) (concluding "continuous injury" trigger should be adopted for third party liability insurance cases involving continuous or progressively deteriorating losses); *American Employer's Ins. Co. v. Pinkard Constr. Co.*, 806 *P.*2d 954, 956 (Colo.Ct.App.) (holding that because corrosion was progressive and continuous condition, each policy issued during period that damage occurred was triggered), *cert. dismissed,* 831 *P.*2d 887 (Colo.1991); *Sentinel Ins. Co. v. First Ins. Co.*, 76 *Hawai'i* 277, 875 *P.*2d 894, 917 (1994) (remarking that continuous injury trigger may be employed to apportion equitably liability among insurers); *United States Gypsum Co. v. Admiral Ins. Co.*, 268 *Ill.App.*3d 598, 205 *Ill.Dec.* 619, 643 *N.E.*2d 1226, 1257 (1994) (applying continuous trigger theory to asbestos-related property damage claims), *appeal denied,* 161 *Ill.*2d 542, 208 *Ill.Dec.* 370, 649 *N.E.*2d 426 (1995); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 *Pa.* 29, 626 *A.*2d 502, 507 (1993) (holding all stages of asbestosis disease process, between initial exposure until recognizable incapacitation, as bodily injury sufficient to trigger insurers' obligation to indemnify); *Wisconsin Elec. Power Co. v. California Union Ins. Co.*, 142 *Wis.*2d 673, 419 *N.W.*2d 255, 258 (Wis.Ct.App.1987) (holding that event triggering

Concerning the methodology for dividing responsibility among multiple triggered policies, we unequivocally recognized the conjunction between the continuous trigger and how allocation ultimately would take place:

[W]e believe that common-law resolution of the trigger-of-coverage issue requires that we consider, ·at the same time, the issue of scope of coverage if a policy is triggered. "[T]he choice of trigger theory is related to the method a court will choose to allocate damages between insurers."

[*Id.* at 459, 650 *A.2d* 974 (citing *Northern States Power Co. v. Fidelity & Cas. Co. of N.Y.*, 523 *N.W.2d* 657, 662 (Minn.1994)).]

We went on to explore various approaches including joint and several and pro rata allocation. Diverging from *Keene,*

[w]e rejected joint-and-several allocation, [*Owens–Illinois, supra,*] 138 *N.J.* at 468, 650 *A.2d* 974, a theory under which the problem of indivisible injury is resolved simply by collapsing the continuous injury into one year. Joint-and-several allocation effectively allows a policyholder to simply select one triggered year and exhaust the coverage provided during that period in satisfaction of its claim, *id.* at 459–62, 650 *A.2d* 974, requiring the insurers to sue each other for contribution. We determined that such an approach rested on an assumption not in accordance with the development of the law: "that at every point in the progression the provable damages due to injury in any one of the years from exposure to manifestation will be substantially the same...." *Id.* at 468, 650 *A.2d* 974. We also considered the effect on the allocation issue of "other insurance" clauses, which are provisions typically designed to preclude a double recovery when multiple, concurrent policies provide coverage for a loss. We determined that such clauses were not generally applicable in the continuous-trigger context where successive rather than concurrent policies were at issue. *Id.* at 470, 650 *A.2d* 974. In sum, we found the contract language and the traditional rules of interpretation to be unhelpful in settling on the proper method of allocating responsibility. *Id.* at 468–71, 650 *A.2d* 974.

Rather, our resolution of the issue was guided by our concern for the efficient use of resources to address the problem of environmental disease and by the demands of simple justice. *Id.* at 472–73, 650 *A.2d* 974.

[*Carter–Wallace, supra,* 154 *N.J.* at 321–22, 712 *A.2d* 1116.]

Instead, we adopted what is called a pro-ration by years and limits method of allocation. We stated that

"any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure," and concluded that the "better formula" was to "allocate[ ] the losses among the carriers on the basis of the extent of the

insurance policies began with installation of faulty power supply system and

risk assumed, *i.e.*, proration on the basis of policy limits, multiplied by years of coverage."

> [*Carter–Wallace, supra,* 154 *N.J.* at 322, 712 *A.*2d 1116 (citing *Owens–Illinois, supra,* 138 *N.J.* at 475, 650 *A.*2d 974 (citing *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.,* 20 *Cal.App.*4th 296, 26 *Cal.Rptr.*2d 35, 57 (1993))).]

Put another way,

> [t]he basis of an individual insurer's liability is the aggregate coverage it underwrote during the period in which the loss occurred. Basically, a given insurer's liability is determined by comparing its particular exposure to the total amount of exposure assumed by all carriers of the triggered policies. This comparison yields a percentage that is then applied to the amount of loss the policyholder sustained.
> [Thomas M. Jones & Jon D. Hurwitz, *An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases,* 10 *Vill. Envtl. L.J.* 25, 44–45 (1999).]

Under that scheme, the insured is required to pay its "aliquot" share of both defense and indemnification on account of years in which it was uninsured, self-insured, or its coverage was exhausted or bankrupt. Erickson, *supra,* 28 *Brief* at 20.

Ultimately, we declared that our choice of the pro-rata allocation method was rooted in the policy considerations that we identified: (1) maximizing resources to cope with environmental injury or damage; (2) giving the greatest incentive to insureds to acquire insurance; and (3) notions of simple justice. *Owens–Illinois, supra,* 138 *N.J.* at 472–73, 650 *A.*2d 974.

## B.

Thereafter, in *Carter–Wallace,* in a case involving the results of pharmaceutical waste disposal, we were faced with the question of how the responsibility of primary and excess insurers[4] is measured in the context of environmental damage over many years

---

continued until problem was resolved), *review denied,* 142 *Wis.*2d 954, 419 *N.W.*2d 563 (1988).

4 Primary insurance provides first dollar liability coverage up to the limits of the insurance contract, usually subject to a deductible. It potentially attaches upon the happening of an insured liability. Scott M. Seaman & Charlene Kittredge, *Excess Liability Insurance: Law and Litigation,* 32 *Tort & Ins. L.J.* 653, 655 (1997). Excess insurance is secondary coverage that ordinarily attaches only after a predetermined amount of primary insurance or self-insured retention has been exhausted. *Id.* at 656.

with a continuous trigger of liability. 154 *N.J.* at 317, 712 *A.*2d 1116.

We reaffirmed the continuous trigger principle and held, as we had in *Owens–Illinois,* that the contract language in the CGL policy and traditional rules of insurance policy interpretation were inadequate to determine the proper method of allocation among primary, first and second level excess insurers. *Id.* at 325, 712 *A.*2d 1116. Again, our assessment was not based on ambiguity in the insurance policy, but on the inherent difficulty of attempting to fairly allocate liability coverage in a long-tail environmental exposure case. *Id.* at 322, 712 *A.*2d 1116.

The second level excess policy that was at issue in *Carter–Wallace* provided $1 million in coverage in excess of $5.1 million in underlying primary and first layer excess coverage. *Id.* at 319, 712 *A.*2d 1116. In addition, condition J of the policy was an exhaustion clause that provided in pertinent part that "[l]iability under this policy with respect to any occurrence shall not attach unless and until the insured, or the insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence." *Ibid.*

Although there was nothing unclear about that provision, we rejected the excess insurers' horizontal exhaustion theory that stated that all primary and first layer excess policies in effect throughout the seventeen-year trigger period had to be exhausted prior to any second layer excess liability attaching. *Id.* at 324, 712 *A.*2d 1116. We also rejected the insured's proposal that the entire loss should be collapsed into a single year so that the excess layer would be reached. *Id.* at 325, 712 *A.*2d 1116.

Instead, we opted for an allocation method we characterized as "more faithful" to the principles articulated in *Owens–Illinois.* Ibid. Citing *Chemical Leaman Tank Lines v. Aetna Cas. & Sur. Co.,* 978 *F.Supp.* 589 (D.N.J.1997), *rev'd on o.g.,* 177 *F.*3d 210 (3d Cir.1999), we adopted a vertical loss allocation by year. *Carter–Wallace, supra,* 154 *N.J.* at 326–27, 712 *A.*2d 1116. Thus, for example, if in a given year primary coverage was $100,000, first-

level excess, $200,000 and second-level excess $450,000, and the pro-rata loss allocated to that year was $325,000, "the primary insurer would pay $100,000, the first-level excess policy would be responsible for $200,000, and the second-level excess policy would pay $25,000." *Ibid.* In other words, the model consists of a horizontal axis made up of the number of years during which damages occurred and a vertical axis containing the pro-rata damages assigned to a specific year. Under that scheme, after pro-ration of damages horizontally, the policies implicated in each particular year are exhausted vertically. Accordingly, the primary policy in a particular year answers until its limits are exhausted, then the first-level excess policy answers until its limits are exhausted and the vertical exhaustion scheme continues until all of the damages assigned to the particular year are covered or all of the insurance policies' limits are exhausted, whichever occurs first.

Echoing the policy considerations relied on in *Owens–Illinois,* we stated:

[T]his approach makes efficient use of available resources because it neither minimizes nor maximizes the liability of either primary or excess insurance, thereby promoting cost efficiency by spreading costs. That method also promotes simple justice, by respecting the distinction between primary and excess insurance while not permitting excess insurers unfairly to avoid coverage in long-term, continuous-trigger cases. Additionally, adoption of that allocation method will introduce a degree of certainty and predictability into the complex world of environmental insurance litigation in continuous-trigger cases.

. . . .

[W]e anticipate that the principles of *Owens–Illinois,* as clarified by our decision today, represent the presumptive rule for resolving the allocation issue among primary and excess insurers in continuous trigger liability cases unless exceptional circumstances dictate application of a different standard.

[*Carter–Wallace, supra,* 154 *N.J.* at 327–28, 712 *A.*2d 1116 (internal citations and quotation marks omitted).]

*See also Quincy Mut. Fire Ins. Co. v. Borough of Bellmawr,* 172 *N.J.* 409, 419, 799 *A.*2d 499 (2002) (observing that "[o]ur decision in *Owens–Illinois* was compelled by important public policy considerations, including the need to adapt our tort law to the peculiarities of mass-exposure tort cases").

## III

PRP argues that the Appellate Division erred in enforcing the non-cumulation clause because it is inapplicable when a separate occurrence takes place in each year of successive CGL policies, because it is an invalid other-insurance or escape clause, and because it effectively circumvents the continuous trigger and allocation model adopted in *Owens–Illinois*.

The GAF *amici* echo that argument, contending that the allocation methodology established in *Owens–Illinois* and *Carter–Wallace* is incompatible with Liberty's non-cumulation clause and that the policy interests underpinning those decisions would be undermined if insurers could contract away their risk through like clauses.

Liberty counters that the Appellate Division's decision does not disturb either *Owens–Illinois* or *Carter–Wallace,* that the claim against Spaulding derived from a single occurrence thus reducing Liberty's liability to a single year of coverage, and that other courts have found similarly worded non-cumulation clauses unambiguous and enforceable.

The Complex Claims Litigation Association *amicus* sides with Liberty and argues in favor of the Appellate Division decision. In essence, it urges enforcement of what it characterizes as an unambiguous non-cumulation clause in order to give the insurer and the policyholder "what they bargained for."

## IV

As scholars and treatise writers, without exception, have concluded, *Owens–Illinois* was a "watershed" in the cripplingly complex area of long-tail environmental exposure insurance coverage. Erickson, *supra,* 28 *Brief* at 20; *see* Jones & Hurwitz, *supra,* 10 *Vill. Envtl. L.J.* at 45 (*Owens–Illinois* is "seminal" case adopting "pro-ration by years and limits"); Barbara Hopkinson Kelly & Colin P. Hackett, *Environmental Insurance Coverage Claims and Litigation: Trends and Emerging Coverage Issues,* 718 *PLI/*

*Comm* 99, 123 (PLI Comm. Law & Practice Course Handbook Series No. A4–4477, May–June 1995) (stating that *Owens–Illinois* decision is "significant" and should be persuasive authority in other jurisdictions addressing environmental contamination cases involving trigger and allocation issues); Michael A. Orlando et al., *Recent Developments in Insurance Coverage Litigation*, 34 *Tort & Ins. L.J.*, 481, 498 (1999) (*Owens–Illinois* regarded as "landmark" decision).

What made *Owens–Illinois* so important is that it looked beyond contract language and traditional rules of insurance policy interpretation to develop a fair and uniform methodology for addressing complex environmental insurance coverage issues. Bratspies, *supra*, 1999 *BYU L.Rev.* at 1236; Erickson, *supra*, 28 *Brief* at 21; Garrett G. Gillespie, Note, *The Allocation of Coverage Responsibility Among Multiple Triggered Commercial General Liability Policies in Environmental Cases: Life After Owens–Illinois*, 15 *Va. Envtl. L.J.* 525, 550–52 (1996). Specific policy goals are at the heart of that methodology, including maximization of resources available for environmental cleanup; creating incentives for the purchase of insurance; and notions of simple justice. Barry R. Ostrager & Thomas R. Newman, *Handbook on Ins. Coverage Disputes* § 9.04 (9th ed.1998); Erickson, *supra*, 28 *Brief* at 21; Jones & Hurwitz, *supra*, 10 *Vill. Envtl. L.J.* at 45–46; Joren S. Bass, Note, *The Montrose Decision and Long–Tail Environmental Liability: A New Approach to Allocating Risk Among Multiple Third–Party Insurers*, 5 *Hastings W.-Nw. J. Envtl. L. & Pol'y* 209, 220 (1999); Gillespie, *supra*, 15 *Va. Envtl. L.J.* at 573–77 (1996).

To achieve those goals, *Owens–Illinois* declared that long-tail environmental exposure injury and damage would no longer be treated as one continuous occurrence, giving rise to joint and several liability by each insurer up to the full limit of its policy (with the policyholder or injured party choosing which year's policy would pay all the damages), but would be treated as one occurrence per year triggering all applicable policies, allocated pro

rata, based on the degree of risk assumed. *Owens–Illinois, supra,* 138 *N.J.* at 478–79, 650 *A.*2d 974. The intent of *Owens–Illinois* in changing the allocation method among insurers was to find a fairer way to divide the damages among all the insurers whose policies provide coverage. Kelly & Hackett, *supra,* 718 *PLI/Comm* at 124–26; Orlando et al., *supra,* 34 *Tort & Ins. L.J.* at 498; Seaman & Kittredge, *supra,* 32 *Tort & Ins. L.J.* at 680. Integral to the scheme was the devolution of a portion of liability upon insureds for time periods in which they chose to "go bare" or self-insure. Ostrager & Newman, *supra,* § 9.04; Bratspies, *supra,* 1999 *BYU L. Rev.* at 1236–37; Bass, *supra,* 5 *Hastings W.-Nw. J. Envtl. L. & Pol'y* at 220; Gillespie, *supra,* 15 *Va. Envtl. L.J.* at 549.

As legal writers have recognized, it is obvious that *Owens–Illinois* did not simply provide an interim measure calculated to fill in an ambiguous policy provision. Indeed, we noted that the policies were not ambiguous. *Owens–Illinois,* 138 *N.J.* at 457, 650 *A.*2d 974. What made their language "unhelpful" was the difficulty inherent in trying to allocate insurance coverage in long-tail environmental exposure cases. That, in turn, created the need for an entirely different approach to environmental exposure coverage issues because "traditional techniques of contract interpretation cannot produce a coherent result." *Id.* at 471, 650 *A.*2d 974 (citing Note, *Adjudicating Asbestos Insurance Liability: Alternatives to Contract Analysis,* 97 *Harv. L.Rev.* 739, 743 (1984)).

> [I]n *Owens–Illinois,* the New Jersey Supreme Court overturned well established New Jersey law.... [T]he court took an issue that had been addressed by many courts around the country and forged a wholly new answer.... [T]he court ignored traditional rules of insurance policy construction founded on contra [proferentum] and based its holding on considerations of public policy.
>
> [Gillespie, *supra,* 15 *Va. Envtl. L.J.* at 573 (quoting Robert B. Chesler & David A. Thomas, *New Jersey Insurance Law After Signo, Morton, Gilbert Spruance, and Owens–Illinois,* 9 *Mealey's Litig. Rep.* 18, 24 (Mealey ed.1995)).]

In a word, *Owens–Illinois* eliminated reliance on particular contract language (other than limits and exclusions) and on traditional rules of interpretation, and set forth a uniform standard for resolving allocation issues in long-tail environmental exposure

cases. *See Carter–Wallace, supra,* 154 *N.J.* at 328, 712 *A.*2d 1116 (observing that principles of *Owens–Illinois,* as clarified by *Carter–Wallace,* represent "presumptive rule" for resolving allocation issue in continuous trigger liability cases unless "exceptional circumstances" dictate application of different standard). It did so because of "the need for courts to choose one method, and apply it consistently, when allocating liability for progressive injuries." *Ibid.* (quoting Comment, *Allocating Progressive Injury Liability Among Successive Insurance Policies,* 64 *U. Chi. L.Rev.* 257, 259 (1997)).

## V

■ The question presented is whether the non-cumulation clause in Liberty's CGL policies can be enforced consonant with the rules we adopted in *Owens–Illinois* and affirmed in *Carter–Wallace.* The answer is that it cannot.

Importantly, that outcome is not dependent on technical characterizations of the non-cumulation clause. To be sure, PRP's argument that the non-cumulation clause is an invalid other-insurance clause under *Owens–Illinois* overreads that case and was rejected properly by the Appellate Division. *Spaulding Composites, supra,* 346 *N.J.Super.* at 179–80, 787 *A.*2d 238. As that court noted, the two types of clauses are quite different. Other-insurance clauses typically preclude double recovery when multiple concurrent policies cover a loss. *Carter–Wallace, supra,* 154 *N.J.* at 322, 712 *A.*2d 1116. On the contrary, a non-cumulation clause governs successive policies and prevents the accretion of limits when the policies have been triggered by a single occurrence. *See* Ostrager & Newman, *Handbook on Ins. Coverage Disputes* § 11.02 (stating that "non-cumulation" clauses reduce limit of liability by any amounts paid by insurer under prior policies with respect to same occurrence). *Owens–Illinois* properly recognized that other-insurance clauses essentially are irrelevant in resolving coverage issues involving multiple successive policies. *Owens–Illinois,* 138 *N.J.* at 470, 650 *A.*2d 974 (observing

that "[i]f the policies do not overlap, such clauses are not generally applicable"). Nothing in that conclusion disposes of the question of the validity of a non-cumulation clause. *Spaulding Composites, supra,* 346 *N.J.Super.* at 178–79, 787 *A.*2d 238.

The Appellate Division likewise rejected PRP's further argument that the non-cumulation clause is an invalid escape clause. *Id.* at 179–80, 787 *A.*2d 238. Because it is well settled that an escape clause is a sub-species of other insurance, *see* 15 *Couch on Ins.* § 219:5 at 219–12 (3d ed.1999) (observing that there are three basic types of other-insurance clauses including escape clause), and because a non-cumulation clause is not an other-insurance clause, it follows that a non-cumulation clause technically is not an escape clause. Whether it suffers from the same deficiencies has been the subject of several judicial opinions with different results. *See Air Prods. & Chems. Inc. v. Hartford Accident & Indem. Co.,* Civ. A. No. 86–7501, 1989 *WL* 73656, at *2 (E.D.Pa. June 30, 1989) (holding that non-cumulation provision did not constitute escape clause, as it only sought to limit, rather than preclude, insurer's liability for claims pending against insured), *vacated in part on o.g.,* 25 *F.*3d 177 (3d Cir.1994). *But see UTI Corp. v. Fireman's Fund Ins. Co.,* 896 *F.Supp.* 362, 378 (D.N.J.1995) (invalidating non-cumulation clause found in other insurance language of policy as unenforceable escape clause, remarking that it is "unacceptable for an insurance company to provide no coverage under a policy for which it received premiums"); *Consolidated Asbestos Coverage Cases, Decision Concerning Phase IV Issues,* No. 1072 (Cal. Jud. Coord. Panel Aug. 29, 1988) (refusing to enforce non-cumulation provision in asbestos context concluding that clause was analogous to "escape" other-insurance clauses that generally are disfavored under law). In any event, we need not resolve that issue here.

As we have indicated, the outcome of this case does not depend on a technical characterization of Liberty's non-cumulation clause, but on the nature of the clause itself. As all parties agree, a non-cumulation clause generally, and Liberty's in particular, operates

to limit an insurer's liability under multiple sequential CGL policies where losses related to a "single occurrence" trigger the successive policies. At the heart of a non-cumulation clause is the notion of a "single occurrence" with multiple year effects. Underlying that notion is the "single occurrence" language of the clause that states that damage "arising out of continuous or repeated exposure to substantially the same general conditions shall be construed as arising out of one occurrence." What the non-cumulation clause seeks to avoid is the "cumulation" of insurance policy limits when only one insured act or "occurrence" is involved. *Owens–Illinois* clearly rejected the idea that in an environmental exposure case, successive policies are triggered by a "single" occurrence. As Judge Brotman underscored in *Chemical Leaman, supra,*

> [t]he New Jersey Supreme Court in *Owens–Illinois* held that under the continuous trigger theory it was propounding, progressive indivisible property damage *should be* treated as an occurrence within each of the years of a CGL policy. *On its face*, this language appears to direct treatment of progressive property damage as distinct occurrences triggering per-occurrence limits in each year of a policy.
>
> [978 *F.Supp.* at 607 (internal citations and quotation marks omitted) (emphasis added).]

So viewed, the "single occurrence" language does not implicate "cumulation" of policy limits for damage arising out of a single occurrence and is therefore inapplicable by its own terms.

■ But even if the non-cumulation clause was not facially inapplicable, we would not enforce it because it would thwart the *Owens–Illinois* pro-rata allocation modality. Once the court turns to pro rata allocation, it makes sense that the non-cumulation clause, which would allow the insurer to avoid its fair share of responsibility, drops out of the policy. Indeed, that is the holding of *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 283 *Ill.App.*3d 630, 219 *Ill.Dec.* 62, 670 *N.E.*2d 740, *appeal denied*, 169 *Ill.*2d 570, 221 *Ill.Dec.* 439, 675 *N.E.*2d 634 (1996), to which we subscribe.

There, the insured, Outboard Marine Corporation (OMC), sought a declaratory judgment that its CGL insurer was obligated to defend it against a suit by governmental agencies concerning

water pollution over a period of years. *Id.* at 745. One of OMC's excess insurers, the Home Insurance Company (Home), claimed that its maximum liability to OMC was $2 million because of a non-cumulation clause in Home's policies that otherwise stated that its maximum liability was $3 and $5 million respectively. *Id.* at 746. After applying the continuous trigger theory to the case and determining that each excess insurer would be liable to OMC based on a pro-rata-time-on-the-risk basis, *id.* at 749–50, the court held the non-cumulation clause unenforceable, stressing that its application would thwart the pro-rata methodology, "would give the insurers a double credit and would deprive the insured of the full value of its premium." *Id.* at 750.

That analysis is wholly congruent with our own. The pro-rata sharing methodology has, at its core, a public policy that favors maximizing, in a fair and just manner, insurance coverage for cleanup of environmental disasters. By applying the non-cumulation clause, insurers who were actually "on the risk" would be insulated from their fair share of liability in direct contravention of *Owens–Illinois*. *See* 15 *Couch* supra. *§ 220:30 (3d ed. 1999) ("Once a court has determined that a loss is to be shared among sequential insurers on a pro rata basis, 'prior insurance' and 'non-cumulation of liability' clauses in the policies become unenforceable.")*.

We note that none of the cases cited as support for the enforceability of a non-cumulation clause by Liberty and its *amicus* involves application of the continuous trigger and pro-rata allocation methodology of *Owens–Illinois*. *See, e.g., Dickies Indus. Servs., Inc. v. Liberty Mut. Ins. Co.,* CA No. 1:97–CV–1391–WBH at *3 (N.D.Ga., Aug. 29, 2000) (deciding case prior to federal district court's "educated guess" that manifestation trigger would ultimately be rejected by Georgia courts in favor of continuous coverage trigger); *Endicott Johnson Corp. v. Liberty Mut. Ins. Co.,* 928 *F.Supp.* 176, 181 (N.D.N.Y.1996) (applying injury-in-fact trigger—where coverage triggered if actual injury takes place during policy period), *appeal dismissed,* 116 *F.*3d 53 (2d Cir.1997);

*O–I Brockway Glass Container, Inc. v. Liberty Mut. Ins. Co.*, Civ. No. 90–2797, 1994 *WL* 910935 (D.N.J. Feb.10, 1994) (deciding case prior to New Jersey's adoption of continuous trigger and pro-rate allocation doctrines); *Air Prods. & Chems. Co. v. Hartford Acc. & Indem. Co.*, 707 *F.Supp.* 762, 769 (E.D.Pa.1989) (applying continuous trigger but apportioning liability among triggered policies "chronologically and seriatim"), *vacated in part on o.g.*, 25 *F.*3d 177 (1994). Because the conflict between *Owens–Illinois* and Liberty's non-cumulation clause is the basis for our holding, the cited decisions have no relevance here.

## VI

Our sole determination in this case is that Liberty's non-cumulation clause is unenforceable under *Owens–Illinois*. We take no position on the number of occurrences, the actual allocation of responsibility as between carriers, or any other issue except to reaffirm the vitality of the *Owens–Illinois* approach and our commitment to its uniform application.

## VII

The judgment of the Appellate Division is reversed. The trial court's grant of summary judgment on the non-cumulation clause in favor of PRP is reinstated.

*For reversing*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

*Opposed*—None.