843 A.2d 1094

BENJAMIN MOORE & CO., PLAINTIFF–APPELLANT, v. AETNA CASUALTY & SURETY COMPANY, AGRICULTURAL EXCESS & SURPLUS INSURANCE COMPANY, AIU INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, AS SUCCESSOR TO NORTHBROOK EXCESS & SURPLUS INSURANCE COMPANY, FORMERLY KNOWN AS NORTHBROOK INSURANCE COMPANY, AMERICAN CENTENNIAL INSURANCE COMPANY, AMERICAN CONTINENTAL INSURANCE COMPANY, AMERICAN EXCESS INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, AMERICAN NATIONAL FIRE INSURANCE COMPANY, AMERICAN RE–INSURANCE COMPANY, AMERICAN ZURICH INSURANCE COMPANY, CALIFORNIA UNION INSURANCE COMPANY, CENTURY INDEMNITY COMPANY, AS SUCCESSOR TO CIGNA SPECIALTY INSURANCE COMPANY, AS SUCCESSOR TO CALIFORNIA UNION INSURANCE COMPANY, CENTURY INDEMNITY COMPANY, AS SUCCESSOR TO CCI INSURANCE COMPANY, AS SUCCESSOR TO INSURANCE COMPANY OF NORTH AMERICA AND INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, CITY INSURANCE COMPANY, COMMERCIAL UNION INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY, CONTINENTAL CORPORATION, AS SUCCESSOR TO HARBOR INSURANCE COMPANY, CONTINENTAL INSURANCE COMPANY, EMPLOYERS INSURANCE OF WAUSAU, AS SUCCESSOR TO EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, EVEREST RE–INSURANCE COMPANY, AS SUCCESSOR TO PRUDENTIAL RE–INSURANCE COMPANY, EXECUTIVE RISK INDEMNITY INC., AS SUCCESSOR TO AMERICAN EXCESS INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, FIRST STATE INSURANCE COMPANY, GIBRALTAR CASUALTY COMPANY, GRANITE STATE INSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, GULF INSURANCE COMPANY, HARBOR INSURANCE COMPANY, HARTFORD ACCIDENT & INDEMNITY COMPANY, HIGHLANDS INSURANCE COMPANY, HOME INSURANCE COMPANY, HOME INSURANCE COMPANY, AS SUCCESSOR TO CITY INSURANCE COMPANY, INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, INSURANCE COMPANY OF NORTH AMERICA, INSURANCE

COMPANY OF THE STATE OF PENNSYLVANIA, INTERNATIONAL INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, MANHATTAN FIRE & MARINE INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, NEW JERSEY PROPERTY LIABILITY INSURANCE GUARANTY ASSOCIATION, NORTH RIVER INSURANCE COMPANY, NORTH STAR RE–INSURANCE CORP., NORTHBROOK EXCESS & SURPLUS INSURANCE COMPANY, NORTHBROOK INSURANCE COMPANY, PACIFIC EMPLOYERS INSURANCE COMPANY, PRUDENTIAL RE–INSURANCE COMPANY, PURITAN INSURANCE COMPANY, ROYAL INDEMNITY COMPANY, TIG PREMIER INSURANCE COMPANY, AS SUCCESSOR TO TRANSAMERICA PREMIER INSURANCE COMPANY, TRANSAMERICA PREMIER INSURANCE COMPANY, TRANSIT CASUALTY COMPANY, TRANSPORTATION INSURANCE COMPANY, TRAVELERS CASUALTY & SURETY CO., AS SUCCESSOR TO AETNA CASUALTY & SURETY CO., UNITED STATES FIRE INSURANCE COMPANY, AND WESTPORT INSURANCE CORPORATION, FORMERLY KNOWN AS PURITAN INSURANCE COMPANY, FORMERLY KNOWN AS MANHATTAN FIRE & MARINE INSURANCE COMPANY, DEFENDANTS, AND LUMBERMENS MUTUAL CASUALTY COMPANY, DEFENDANT–RESPONDENT.

Argued November 5, 2003—Decided March 24, 2004.

*Paul E. Breene* argued the cause for appellant (*Anderson Kill & Olick,* attorneys). *Katherine E. Tammaro,* a member of the Illinois bar, argued the cause for respondent (*Tressler, Soderstrom, Maloney & Priess,* attorneys; *Ms. Tammaro* and *Albert C. Hilber,* on the briefs).

*Arnold L. Natali, Jr.,* argued the cause for *amici curiae* CSR Limited and Island Transportation Corp. (*McCarter & English,* attorneys; *Mr. Natali* and *Andrew T. Berry,* of counsel; *Mr. Berry, J. Wylie Donald* and *Alissa Pyrich,* on the brief).

*Wendy L. Mager* submitted a brief on behalf of *amici curiae* Chubb & Son—a Division of Federal Insurance Company, Farmers Insurance Group, Hartford Insurance Group, Liberty Mutual Insurance Company, Royal & SunAlliance, Selective Insurance Company of America, St. Paul Fire and Marine Insurance Company and Zurich American Insurance Company (certain members of the Complex Insurance Claims Litigation Association (*Smith, Stratton, Wise, Heher & Brennan,* attorneys).

Justice LONG delivered the opinion of the Court.

Because of the scientific uncertainties inherent in pinpointing the onset and course of progressive environmental injury, tradi-

tional liability insurance contract language did not resolve the question of when an "occurrence" takes place in that context. In *Owens–Illinois, Inc. v. United Insurance Co.*, 138 *N.J.* 437, 650 *A.*2d 974 (1994), we adopted the continuous-trigger theory, which posits that such injury occurs during each phase of environmental contamination from exposure to manifestation. *Id.* at 451, 650 *A.*2d 974. We held such injury to be an "occurrence" triggering each applicable insurance policy. We likewise devised a method to quantify the amount of injury to which each policy would be required to respond, thereafter allowing long-tail environmental damage to fall within the ordinary insurance paradigm (coverage for losses within the policy period in accordance with the terms and conditions of the applicable insurance contract). In *Carter–Wallace, Inc. v. Admiral Insurance Co.*, 154 *N.J.* 312, 712 *A.*2d 1116 (1998), we applied the *Owens–Illinois* methodology to evaluate the relative responsibility of primary and excess insurers, holding that although damages are determined without reference to excess layers, each layer of excess insurance must be exhausted in each policy year before the next layer is reached.

This case presents the novel issue of whether, in a long-tail environmental exposure case, an insured must satisfy the full deductible for each triggered policy before it is entitled to indemnity from the insurer, or whether the deductibles should be allocated in some fashion. The trial court and the Appellate Division both held that the full per-occurrence deductible in each triggered policy must be satisfied before the insured is entitled to indemnity. Because that conclusion fully accords with what we envisioned in *Owens–Illinois*, we now affirm.

I

In 2000, Benjamin Moore & Company filed a declaratory judgment action seeking defense and indemnity from Lumbermens Mutual Casualty Company in connection with two class action law suits alleging bodily injury and property damage as a result of exposure to lead paint distributed by Benjamin Moore. The suit

was based on Lumbermens's issuance of five Comprehensive General Liability (CGL) insurance policies to Benjamin Moore covering the eleven year period between September 30, 1990, and September 30, 2001. The policies can be described as follows:

| Policy Number | Policy Period | Limits | Deductible |
|---|---|---|---|
| 3YL 950 740-00 | 9/30/90-9/30/91 | $1 million per occurrence | $500,000 |
| 3YL 950 894-00 | 9/30/91-9/30/92 | $1 million per occurrence | $500,000 |
| 3YL 950 894-01 | 9/30/92-9/30/93 | $1 million per occurrence | $250,000 [1] |
| 5YL 950 894-02 | 9/30/93-9/30/94 | $1 million per occurrence | $250,000 |
|  | 9/30/94-9/30/95 | $1 million per occurrence | $250,000 |
|  | 9/30/95-9/30/96 | $1 million per occurrence | $250,000 |
|  | 9/30/96-9/30/97 | $1 million per occurrence | $250,000 |
|  | 9/30/97-9/30/98 | $1 million per occurrence | $250,000 |
| 5YL 950 894-03 | 9/30/98-9/30/99 | $1 million per occurrence | $250,000 |
|  | 9/30/99-9/30/00 | $1 million per occurrence | $250,000 |
|  | 9/30/00-9/30/01 | $1 million per occurrence | $250,000 |

It is undisputed that for each "occurrence" covered under the several policies, Benjamin Moore had agreed to pay either the first $500,000 or the first $250,000 of the loss, and Lumbermens had agreed to pay the remaining $500,000 or $750,000 of the loss, depending on the applicable deductible. An underwriting consultant employed by Lumbermens expressed the view that due to the deductibles, the premiums that Benjamin Moore paid were lower than they would have been had it sought "guaranteed cost or first-

---

[1] A discrepancy exists in the briefs submitted as to whether the deductible for this year is $250,000 or $500,000.

dollar primary coverage for the same limits in the same policy period[.]"

The deductibles are contained in what is denominated as the "Deductible Liability Endorsement" (DLE). The DLE modifies and amends certain aspects of the policies. Although the language contained in the DLE varies slightly from policy to policy, the parties do not claim that any minor language variation is material to the issue presented for our review.

The following language comes from a representative DLE. The section entitled "Deductible Amount" states:

A. Our obligation to pay damages on behalf of the insured applies only to that amount of the limits of insurance that remains after deducting the **Deductible Amount** stated in the schedule of this endorsement.

B. The **Deductible Amount** applies to all damages and claim expense for all coverage of this policy combined as the result of any one "occurrence" for bodily injury and property damage combined, and per person or organization for any other covered injury or damage.

C. In addition to amounts we pay as damages, amounts you pay or reimburse us for damages paid within the deductible will use up the applicable limits of insurance, including the aggregate limits.

D. Nothing in this endorsement shall obligate us to pay any amount after the applicable limit of insurance has been used up in the payment of judgments or settlements.

The subject of "Allocation of Costs of Defense, Investigation and Settlement" contains the following language:

A. When the total amount of all damages and claim expense paid for all claims or "suits" as a result of any one "occurrence" or offense does not exceed the **Deductible Amount**, we will not be obligated to pay any part of the claim expense.

B. When the total amount of damages and claim expense paid for all claims or "suits" as a result of any one "occurrence" of offense is in excess of the **Deductible Amount**, we will be obligated to pay that part of the claim expense that exceeds the **Deductible Amount.**

In essence, the DLE provides that the insurer is obligated to pay only the amount of the insurance limit left after subtracting the deductible and that the deductible applies on a per occurrence basis.

The parties filed cross-motions for summary judgment. Benjamin Moore sought an order permitting it to choose the Lumber-

mens's policy under which it would be defended and ordering that it only be required to pay one deductible. Alternatively, Benjamin Moore requested that the trial court "order that deductibles in multiple, consecutively triggered insurance policies be allocated on the same basis as insurance coverage is allocated" under *Owens–Illinois* and *Carter–Wallace.* Lumbermens sought a declaration that Benjamin Moore must "satisfy each per occurrence deductible in each triggered policy without proration before Benjamin Moore [is] entitled to coverage."

The trial court recognized that neither *Owens–Illinois* nor *Carter–Wallace* had addressed the precise question before it but took guidance from the principles established in those cases. The court rebuffed Benjamin Moore's request to choose a policy under which it would be defended, noting that we previously had declined to adopt such a " 'joint and several' allocation scheme." *Ibid.* (citing *Carter–Wallace, supra,* 154 *N.J.* at 321, 712 *A.2d* 1116). The court next rejected Benjamin Moore's assertion that the deductibles in the triggered policies should be prorated in the same fashion as the losses under the *Owens–Illinois* and *Carter–Wallace,* concluding that deductibles in multiple, consecutively triggered policies should be enforced as written and that pro rata allocation would not be consistent with those cases.[2] The court therefore denied Benjamin Moore's motion, and granted partial summary judgment in favor of Lumbermens.

The Appellate Division granted Benjamin Moore's motion for leave to appeal and affirmed the trial court's decision. In ruling,

---

[2] In ruling, the court placed reliance on the opinion of Special Master Richard Cohen in *Pfizer Inc. v. Employers Insurance Company of Wausau,* No. MID–C–108–92 (*N.J.Super.* Ch.Div.1999), *leave to appeal granted,* 163 *N.J.* 391, 749 *A.2d* 366 (2000), *appeal dismissed,* 167 *N.J.* 84, 769 *A.2d* 1047 (2001), that had concluded, in a cognate setting, that triggering a policy does not guarantee that coverage will be afforded, but only calls into play the policy terms. Special Master Cohen stated that "on the basis of clear and unambiguous policy language, the inescapable resolution is that every occurrence carries both the policy's per-occurrence liability limit, and the policy's per-occurrence deductible." *Id.* Although acknowledging that *Pfizer* was not binding, the trial court found that opinion to be "highly instructive" and "clear and well-reasoned."

the panel recognized that the issue of how to treat deductibles under *Owens–Illinois* was, as yet, undecided. In concluding that the trial court was accurate in its analysis, the panel relied on, among other things, the unambiguous policy terms and on the fact that Benjamin Moore had risked high deductibles to reduce its premiums. The panel also broadly analogized the situation to that presented in *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co.,* 978 *F.Supp.* 589, 606 (D.N.J.1997), *rev'd on other grounds,* 177 *F.3d* 210 (3d Cir.1999), which held that "each layer of excess coverage in a given year must exhaust before the next layer will be required to begin paying indemnity costs to [the insured]." *Ibid.* The panel thus reasoned that, in a vertical exhaustion scheme, it makes sense that "each layer" includes the deductible. In rejecting Benjamin Moore's effort to apply a joint and several allocation scheme to the policies by choosing one policy to cover its claims and paying only that deductible, the court underscored *Owens–Illinois'* rejection of that approach.

We granted Benjamin Moore's motion for leave to appeal, 176 *N.J.* 70, 819 *A.*2d 1185 (2003), and accorded *amici curiae* status to CSR Limited and Island Transportation Corporation (CSR) and to the Complex Insurance Claims Litigation Association (CICLA).

II

■ Benjamin Moore argues that the policies are ambiguous at best and require interpretation in its favor and against the parties who drafted the language under the doctrine of *contra proferentem.*[3] In addition, it contends, in its brief, that deductibles in multiple triggered policies should be prorated in accordance with the percentage of the losses allocated to the insurer. Put another way, Benjamin Moore posits that each policy's deductible should be multiplied by the percentage of the overall loss assumed by

---

[3] The doctrine of *contra proferentem* requires that an ambiguous provision of a written document "is construed most strongly against the person who selected the language." *Black's Law Dictionary* 296 (5th ed.1979).

that policy under the *Owens–Illinois* formula. In this case, because policies with identical limits covered eleven years and each would bear one-eleventh of the loss, that is the percentage of the deductible Benjamin Moore says it should pay.[4] Finally, it urges us to "scrap" *Owens–Illinois* in favor of "an appropriate 'all sums' joint and several liability approach."

Lumbermens counters that the policies are clear in requiring the satisfaction of the per-occurrence deductibles by Benjamin Moore, that Benjamin Moore's pro-ration argument misconceives the allocation core principles of *Owens–Illinois* by failing to recognize that what is allocated is the policyholder's loss and not the limits of coverage, and finally that this Court already has rejected the joint and several allocation method advanced by Benjamin Moore.

CSR supports a pro rata allocation of deductibles but proposes an entirely different modality than Benjamin Moore. More particularly, CSR argues that an insured in a continuous-trigger case only should be required to satisfy the deductibles for the number of policies necessary to provide coverage for the total loss. The example given is a loss of $3,000,000, allocated under *Owens–Illinois* over ten years during which an insured is covered by ten $1,000,000 policies each with a $100,000 deductible. According to CSR the insured should only have to pay the deductible on three policies ($300,000) because three policies would cover the total loss. It is CSR's view that, thereafter, "the insured's contribution toward the loss is deducted from the total loss and the insurers' contributions are then allocated among the insurers in accordance with *Owens–Illinois/Carter–Wallace* for the amount of risk accepted relative to the other insurers." By the time of oral argument, Benjamin Moore indicated a willingness to adopt that allocation scheme.

---

[4] At oral argument, counsel for Benjamin Moore indicated that only eight years of coverage are actually at play in this case, each with a $250,000 deductible.

CICLA urges the affirmance of the judgment of the Appellate Division based on the insurance contract language, the equities of the situation, and public policy concerns.

## III

In general, CGL policies are designed to respond to easily identifiable and quantifiable losses occurring within the policy period. Because progressive environmental injury claims offer neither of those indicia of certitude, and because historically CGL policies provided no guidance regarding the point at which a long-tail environmental injury becomes an occurrence, it was left to courts to resolve the issue. Rebecca M. Bratspies, *Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies*, 1999 *B.Y.U. L.Rev.* 1215, 1218 (noting that because CGL policies do not provide guidance on how to apportion liability for long-tail injury, common law must fill the gaps).

In *Owens–Illinois*, we first faced the questions of when an occurrence takes place in a progressive environmental exposure case and how to quantify the loss in each policy period. We evaluated the primary theories potentially applicable to such a claim [5] and rejected them in favor of the continuous-trigger theory, the conceptual underpinning of which "is that injury occurs during each phase of environmental contamination—exposure, exposure in residence (defined as further progression of injury even after exposure has ceased), and manifestation of disease." *Owens–Illinois, supra,* 138 *N.J.* at 451, 650 *A.2d* 974. We stated,

---

[5] The exposure theory pinpoints the occurrence as the date on which the injury producing agent first contacts the body. *Owens–Illinois, supra,* 138 *N.J.* at 449–50, 650 *A.2d* 974. The manifestation theory identifies the occurrence as the point at which the disease shows itself. *Ibid.* The injury-in-fact theory holds that coverage is triggered by demonstrating an actual injury or a damage-producing event. *Id.* at 451, 650 *A.2d* 974. Finally, the double-trigger theory holds that injury occurs during exposure to the injury producing agent and during the manifestation of disease, but not necessarily during the intervening period. *Ibid.*

> when progressive individual injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy.
>
> [*Id.* at 478, 650 *A.*2d 974.]

In other words, progressive environmental injury is an occurrence in each policy year thus triggering all relevant primary and excess policies in effect during the period.

The adoption of the continuous-trigger was only the first step in the analysis. The next step was to determine what damage occurred during each of the triggered policy periods in order to calculate the extent of each policy's exposure. If medical evidence could establish the extent of the injury within a policy period, that obviously would govern. *Id.* at 466, 650 *A.*2d 974 (citing hypothetical case of exploding steam boiler as prototypical accident where claimant could show, within reasonable degree of medical probability, that injuries occurred within particular policy period).

However, the same scientific uncertainties that led us to adopt the continuous-trigger informed our analysis on that issue as well. We realized that damage does not necessarily occur in equal installments over a continuum, *ibid.*, and that there is no scientific way to pinpoint exactly what occurs and when. As we later explained in *Carter–Wallace, supra,* we looked to the methods other courts had used to address the issue:

> We rejected joint-and-several allocation, [*Owens–Illinois, supra,*] 138 *N.J.* at 468 [650 *A.*2d 974], a theory under which the problem of indivisible injury is resolved simply by collapsing the continuous injury into one year. Joint-and-several allocation effectively allows a policyholder to simply select one triggered year and exhaust the coverage provided during that period in satisfaction of its claim, *id.* at 459–62 [650 *A.*2d 974], requiring the insurers to sue each other for contribution. We determined that such an approach rested on an assumption not in accordance with the development of the law: "that at every point in the progression the provable damages due to injury in any one of the years from exposure to manifestation will be substantially the same . . . ." *Id.* at 468 [650 *A.*2d 974]. We also considered the effect on the allocation issue of "other insurance" clauses, which are provisions typically designed to preclude a double recovery when multiple, concurrent policies provide coverage for a loss. We determined that such clauses were not generally applicable in the continuous-trigger context where successive rather than concurrent policies were at issue. *Id.* at 470 [650 *A.*2d 974]. In sum, we found the contract language and the traditional rules of interpretation to be

unhelpful in settling on the proper method of allocating responsibility. *Id.* at 468–71 [650 *A.*2d 974].

Rather, our resolution of the issue was guided by our concern for the efficient use of resources to address the problem of environmental disease and by the demands of simple justice. *Id.* at 472–73 [650 *A.*2d 974].

[154 *N.J.* at 321–22, 712 *A.*2d 1116 (citations omitted).]

Ultimately, we adopted what is called a pro-ration by years and limits method of loss allocation. We stated that

"any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure," and concluded that the "better formula" was to "allocate[ ] the losses among the carriers on the basis of the extent of the risk assumed, *i.e.,* proration on the basis of policy limits, multiplied by years of coverage."

[*Id.* at 322, 712 *A.*2d 1116 (citing *Owens–Illinois, supra,* 138 *N.J.* at 475, 650 *A.*2d 974 (citing *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.,* 26 *Cal.Rptr.*2d 35, 57 (1993))).]

We declared that our approach was rooted in the policy considerations that we identified: (1) maximizing resources to cope with environmental injury or damage; (2) giving the greatest incentive to insureds to acquire insurance; and (3) notions of simple justice. *Owens–Illinois, supra,* 138 *N.J.* at 472–73, 650 *A.*2d 974.

Obviously that allocation scheme is not as satisfying as a real scientific assessment of the damage that occurs in each policy period, but it was the best we could do under the circumstances. Under that scheme insurers are allocated losses based on their undertakings, the insured is required to pay its "aliquot" share of both defense and indemnification on account of years in which it is uninsured or self-insured, and the insured also is responsible for years in which coverage is exhausted or its insurer bankrupt. *Spaulding Composites Co., Inc. v. Aetna Casualty & Surety Co.,* 176 *N.J.* 25, 36, 819 *A.*2d 410 (2003) (citing Donald C. Erickson, *Emerging Primary and Excess Coverage Issues in Continuous Trigger Regimes,* 28 *Brief* 18, 20 (Summer 1999)). Once a policy is triggered and the loss for that period is determined, recovery is dependent upon the basic provisions of the insurance contract including "limits and exclusions." *Id.* at 41, 819 *A.*2d 410 (recognizing reliance on "limits and exclusions" when resolving allocation issues in long-tail environmental exposure cases).

In *Carter–Wallace, supra,* we were faced with the question of how the responsibility of primary and excess insurers is measured in the context of environmental damage over many years with a continuous-trigger of liability. 154 *N.J.* at 317, 712 *A.*2d 1116. We rejected the alternatives proposed by the parties,[6] reaffirmed the principles of *Owens–Illinois* and adopted the allocation method set forth in *Chemical Leaman.* Specifically, the Court

> rejected the theory of horizontal exhaustion by layer, and "direct[ed] apportionment of damages among policy years without reference to the layering of policies in the triggered years." *However, the court did note that within any given year, each layer of excess coverage must be depleted before the next level is pierced.* [*Carter–Wallace, supra,* 154 *N.J.* at 326, 712 *A.*2d 1116 (quoting *Chemical Leaman, supra,* 978 *F.Supp.* at 605–06) (emphasis added) (internal citations omitted) (alterations in original).]

Since *Carter–Wallace,* we have twice revisited the *Owens–Illinois* methodology. *See, e.g., Quincy Mutual Fire Ins. Co. v. Borough of Bellmawr,* 172 *N.J.* 409, 799 *A.*2d 499 (2002) (concluding that pro rata allocation of loss among insurers should reflect number of days rather than years on risk when underlying facts require that degree of precision).

Most recently, in *Spaulding, supra,* we were asked to determine the effect of *Owens–Illinois* on the validity of a 'non-cumulation' clause in a [CGL] policy that "operate[d] to limit an insurer's liability under multiple sequential CGL policies where losses related to a 'single occurrence' trigger the successive policies." 176 *N.J.* at 43–44, 819 *A.*2d 410. Again we reaffirmed the allocation methodology we had established in *Owens–Illinois* and then held that the non-cumulation clause was facially inapplicable because at its heart "is the notion of a 'single occurrence' with multiple year effects." *Id.* at 44, 819 *A.*2d 410. We also explained that *Owens–Illinois* "clearly rejected the idea that in an environmental expo-

---

[6] Commercial Union argued for horizontal exhaustion by layer thus precluding the insured from resorting to any second level excess insurance until seventeen years worth of primary and first level excess policies were exhausted. Carter–Wallace proposed that damages incurred over the entire seventeen year period be collapsed into a single policy period. *Carter–Wallace, supra,* 154 *N.J.* at 324–25, 712 *A.*2d 1116.

sure case, successive policies are triggered by a 'single' occurrence." *Ibid.* Rather, progressive indivisible injuries *"should be treated as an occurrence within each of the years of a CGL policy." Ibid.* (emphasis in original) (internal citation and quotation omitted). So viewed, "the 'single occurrence' language does not implicate 'cumulation' of policy limits for damage arising out of a single occurrence and is therefore inapplicable by its own terms." *Ibid.* We also noted that "even if the non-cumulation clause was not facially inapplicable, we would not enforce it because it would thwart the *Owens–Illinois* pro-rata allocation modality." *Ibid.*

In sum, we have consistently reaffirmed our allegiance to *Owens–Illinois,* which provides a significant benefit to insureds in long-tail environmental exposure cases by treating each year of progressive injury as an individual "occurrence" triggering the insurers' obligations to respond under each applicable insurance policy.

However our scheme is not totally one-sided. Policyholders who chose to "go bare" or underinsure must sustain the burden of those choices. Likewise, policyholders are required to underwrite the risk of insurer insolvency or bankruptcy. Moreover, when a policy is triggered, so are its fundamental terms and conditions. Although *Owens–Illinois* did not turn on policy language or traditional interpretation rules because it was crafting an overarching scheme for solving the scientifically unsolvable problem of determining how to allocate progressive environmental damage to sequential policies, that scheme was nevertheless meant to be superimposed on the specific terms of insurance contracts. That is why the *Owens–Illinois* allocation methodology is subject to "limits and exclusions." *Owens–Illinois, supra,* 138 *N.J.* at 476, 650 *A.*2d 974. In other words, *Owens–Illinois* was never intended to displace the basic provisions of the insurance contract so long as those provisions are not inconsistent with the underlying methodology specifically adopted in that case. *Spaulding,* 176 *N.J.* at 44, 819 *A.*2d 410. That is the backdrop for this inquiry.

## IV

■ The question presented is how the deductibles in the policies "triggered" under *Owens–Illinois* are to be treated. We turn first to the policy language. In so doing, we are mindful, as was the Appellate Division, that the words of an insurance policy should be given their plain meaning. *See Harleysville v. Garitta*, 170 *N.J.* 223, 231, 785 *A.*2d 913 (2001) (citing *Zacarias v. Allstate Ins. Co.*, 168 *N.J.* 590, 595, 775 *A.*2d 1262 (2001)); *Gibson v. Callaghan*, 158 *N.J.* 662, 670, 730 *A.*2d 1278 (1999) ( [T]he words of an insurance policy are to be given their plain, ordinary meaning.); Lee R. Russ and Thomas F. Segalla, *Couch on Insurance 3D* 22:38 (1997) ( [W]ords in insurance policies are to be construed using their ordinary and popular meanings. . . . ).

■ When there is doubt, however, regarding the existence of coverage, that doubt is ordinarily resolved in favor of the insured. *Owens–Illinois, supra*, 138 *N.J.* at 471, 650 *A.*2d 974 (noting that ambiguous policy language is construed against insurer as drafter); *Couch on Insurance 3D, supra*, 22:14 (explaining that under rule of *contra proferentem*, uncertain insurance policy language is to be construed against insurer). An exception to that rule exists for sophisticated commercial entities that do not suffer from the same inadequacies as the ordinary unschooled policyholder and that have participated in the drafting of the insurance contract. *Owens–Illinois, Inc. v. United Ins. Co.*, 264 *N.J.Super.* 460, 488, 625 *A.*2d 1 (App.Div.1993) ("[O]nly where it is clear that an insurance policy was actually negotiated or jointly drafted, and where the policyholder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked.) (citing cases), *rev'd in part and remanded on other grounds*, 138 *N.J.* 437, 650 *A.*2d 974 (1994); *McNeilab, Inc. v. North River Ins. Co.*, 645 *F.Supp.* 525, 546 (D.N.J.1986) (noting that insurer and insured had equal bargaining power), *aff'd*, 831 *F.*2d 287 (3d Cir.1986).

The Appellate Division intimated that a large national commercial venture like Benjamin Moore should not have the benefit of

the doctrine of *contra proferentem.* Because of the posture of the case and Benjamin Moore's claim that it was not a meaningful participant in the drafting of the insurance contracts, that conclusion is open to question. However, it is of no consequence because it played no part in the ultimate outcome of the case. In fact, the court declared the policy language to be clear and not to contravene *Owens–Illinois,* a conclusion with which we agree.

Indeed, the DLE expressly states that Lumbermens's obligation to pay damages applies only to that amount of the insurance limits that remains after subtraction of the deductible; and that "[w]hen the total amount of all damages and claim expense paid for all claims or 'suits' as a result of any one 'occurrence' or offense *does not exceed the **Deductible Amount**, we will not be obligated to pay* any part of the claim expense." (emphasis added). Moreover, as Lumbermens correctly observes, there are no provisions in the several policies that suggest, even obliquely, that pro-ration of deductibles is authorized when the insurance limits are not reached. Instead, the DLE states that "[t]he Deductible Amount applies to *all* damages and Claim Expense for *all* coverage of this policy combined as the result of *any one* 'occurrence' for Bodily Injury." (emphasis added).

Benjamin Moore does not argue that the language is facially problematic, but counters that the Appellate Division failed to recognize that it was rendered ambiguous by application of the methodology we adopted in *Owens–Illinois* and *Carter–Wallace.* Specifically, because we departed from the policy language in those cases in fashioning the overall allocation scheme, Benjamin Moore argues that "the Appellate Division's seemingly rote enforcement of the 'plain meaning' of each individual insurance policy in reference to deductibles is absurd[,]" inequitable, and unfair.

There are a number of problems with that notion. First, we specifically acknowledged the applicability of insurance "limits" in *Owens–Illinois. Owens–Illinois, supra,* 138 *N.J.* at 476, 650 *A.*2d 974. The deductible here is specifically described in the DLE as a

functional piece of the "Limits of Insurance," and, as a matter of logic, operates that way in all cases. Moreover, Benjamin Moore's position belies our specific instruction in *Owens–Illinois* and *Spaulding* that the scheme we developed was never intended to displace basic insurance policy provisions except to the extent that those provisions are inconsistent with it.

Benjamin Moore rejoins that satisfaction of deductibles presents such an inconsistency, arguing that if an insurer in an environmental exposure case is allocated only ten percent of the whole loss, a requirement that the insured pay 100% of a triggered policy's deductible is inconsistent with the scheme. That argument actually is an adumbration of Benjamin Moore's real position in this case that progressive environmental damage is a "single occurrence." Indeed, the cases on which it has chosen to rely underscore that that is its basic point. *See, e.g., PECO Energy Co. v. Boden,* 64 *F.*3d 852 (3d Cir.1995) (applying Pennsylvania law and concluding that multitude of thefts over a six year period constituted "single occurrence" warranting application of single deductible). However, in *Owens–Illinois,* we specifically rejected the single occurrence template and determined that progressive environmental injury happens continuously from exposure to manifestation, thus constituting a "separate" occurrence in each policy year.

Benjamin Moore's refusal to accept that progressive environmental injuries are multiple occurrences is the pediment on which its argument stands. We rejected that view in *Owens–Illinois* and our rejection of it was not a slip of the tongue or a mere formalism. The multiple occurrence template is a matter of substance that is at the heart of *Owens–Illinois.* It is what triggers multiple policies, thus maximizing resources available for toxic tort cases. It is what encourages the purchase of insurance. It is what voids "other insurance" clauses. It is what makes "noncumulation" clauses inapplicable. It is what requires a calculation of the loss that occurred during each policy period. It is our effort to regularize the essentially irregular progressive environ-

mental damage case and make it amenable to disposition in accordance with the undertakings in the insurance contract.

In other words, the insurers are not sharing a single loss under the *Owens–Illinois* rationale. Rather, they are being held responsible for the losses that actually occurred on their watch, as calculated in accordance with a formula we developed as a proxy for a scientific assessment of the amount of injury happening at each phase on the continuum. One commentator aptly declared that by the use of the allocation methodology, we are essentially "pretending" that the allocated share was the damage that actually occurred during that policy period. Michael G. Doherty, *Allocating Progressive Injury Liability Among Successive Insurance Policies,* 64 *U. Chi. L.Rev.* 257, 282 (1997).

▮ What is critical is that once the loss during a triggered policy period is determined, *Owens–Illinois* has served its purpose. At that point, the limits of each policy are available and the basic insurance policy provisions apply so long as they are not inconsistent with *Owens–Illinois. Spaulding, supra,* 176 *N.J.* at 44, 819 *A.*2d 410. Put another way, once the amount of loss allocable to the policy period is determined, it is to be treated exactly as any actual loss during that period would be treated in accordance with the policy provisions, including limits and exclusions.

Important as well in assessing Benjamin Moore's allocation of deductibles proposal is that *Owens–Illinois* does not affect the insurance limits in any year of coverage. Those limits remain as contracted for and are fully available to the insured. If the limits of coverage were affected by *Owens–Illinois,* Benjamin Moore's argument would make slightly more sense because of the direct relationship between limits and deductibles. When, as here, the limits of coverage remain untouched, the only effect of the proration of deductibles would be to upset the balance of risk agreed upon between the insurer and the insured. In effect, Benjamin Moore mixes the proverbial apples and oranges by suggesting that

a loss determination formula should somehow alter the contractual relationship between an insured and an insurer.

Perhaps sensing those flaws, at oral argument Benjamin Moore signed on to the proposal of CSR ($300,000 of deductibles for $3 million of coverage). Certainly that proposal does not suffer from the same logical disconnect as that advanced by Benjamin Moore in its brief, but it is equally insupportable. First, it is based on a fundamental misconception that a full deductible should only have to be paid when the limits of an insurance policy are reached. That notion comes out of thin air. More importantly, the need for CSR's model evaporates once *Owens–Illinois* is understood. Again, *Owens–Illinois* is a several step process. The first is the continuous-trigger that accesses all relevant policies. The second is the painstaking allocation of losses to each individual policy period in order to fit the long-tail environmental case into an ordinary insurance model. The third is the invocation of the insurance contract provisions in each triggered policy, so long as they are not in conflict with *Owens–Illinois.*

CSR is willing to accept the first two steps but not the third. Instead, it re-aggregates the losses that we scrupulously allot to each individual policy period under *Owens–Illinois,* essentially treating them as a single loss, and concludes that Benjamin Moore should have to pay only enough deductibles to cover that aggregated loss. The purpose of *Owens–Illinois* was to extricate the long-tail environmental case from the single occurrence modality, to determine which losses should be considered to have occurred in which policy period, and thereafter to allow the individual policy provisions to govern. So understood, CSR's proposal, which views the loss as single and violates the relevant insurance contract provisions, is insupportable.

Benjamin Moore and CSR cannot have it both ways. There is simply no principled basis to treat progressive environmental damage as separate occurrences in order to access insurance coverage but as a fractionalized single occurrence in determining the applicability of deductibles.

Pivotal, as well, to both Benjamin Moore's and CSR's proposals is the idea that requiring the satisfaction of deductibles will reduce the amount of coverage available in environmental exposure cases, thus confounding one of the stated aims of *Owens–Illinois*— maximizing insurance coverage. That is a misreading of *Owens–Illinois*. Our reliance on the notion of "maximization of resources" in *Owens–Illinois* reflected only the fact that our methodology allowed an insured access to *multiple* insurance policies based on our definition of "occurrence." Nothing in *Owens–Illinois* was meant to suggest that insureds have carte blanche to ignore legitimate insurance policy provisions that do not contravene the basic principles of that case simply to obtain more coverage.

In short, we see no warrant for pro-rating or otherwise tampering with deductibles once the *Owens–Illinois* formula is effectuated. Deductibles constitute a bargained-for aspect of the insurance contract that affects the premiums the insured pays. It is true that, in some less significant continuous exposure cases, the deductible may equal or exceed the loss, thus requiring the insured to bear the entire cost. That would also be the case in which an easily identifiable and quantifiable loss occurs within a policy year. Sometimes the deductible will eat up the loss and sometimes not. That is the way insurance works. Insureds purchase policies with deductibles that are directly related to their premiums, risking the possibility that the loss will be low and that the deductible will equal or exceed it. When that occurs, the insured gets exactly what it has bargained for. Sometimes, when losses are in parity with deductibles, the insurer receives the benefit of the bargain. But it is equally true that when a significant environmental loss occurs, *Owens–Illinois* gives the insured the limits of coverage of a series of policies that would not otherwise be available.

We note that our conclusion is in line with the result reached by the majority of courts and commentators that have addressed the issue of pro-rating deductibles in the continuous-trigger setting. *See, e.g., Olin Corp. v. Ins. Co. of N. Am.*, 221 *F.*3d 307, 327–28 (2d

Cir.2000) (citing *In re Prudential Lines Inc.*, 158 *F*.3d 65 (2d Cir.1998)) (holding that each triggered policy's full deductible is applicable because practice of prorating deductibles while not prorating maximum per-occurrence coverage would upset balance of risk between insured and insurer); *Public Serv. Co. of Colo. v. Wallis & Cos.*, 986 *P*.2d 924, 941 (Colo.1999) (holding that "[p]rimary insurance, or alternatively, any [self-insured retention] must first be exhausted" before excess layers of insurance are required to respond);[7] *N. States Power Co. v. Fidelity & Cas. Co. of N.Y.*, 523 *N.W*.2d 657, 664 (Minn.1994) (holding that insured must satisfy the full self-insured retention for each applicable policy period); *Missouri Pac. R.R. Co. v. Int'l Ins. Co.*, 288 *Ill.App*.3d 69, 223 *Ill.Dec.* 350, 679 *N.E*.2d 801, 810 (1997) (stating that self-insured retention constitutes primary coverage, that insured must exhaust before looking to insurers for coverage); *Atchison, Topeka & Santa Fe Ry. v. Stonewall Ins. Co.*, 275 *Kan.* 698, 71 *P*.3d 1097, 1131–32 (2003) (agreeing that insured must exhaust SIRs before looking to insurers for coverage); *Scott's Liquid Gold–Inc. v. Lexington Ins. Co.*, 97 *F.Supp*.2d 1226, 1230–31 (D.Colo.2000) (adopting time on the risk approach of *Public Service Co., supra,* and noting that "[t]he insurer is . . . obligated to pay its share of the liability allocable to each of its policy years, taking into account . . . policy deductibles. . . ."); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 *F*.3d 1178, 1214 (2d Cir.1995) ("[E]ach location at which [insureds] products are present, reflecting a separate installation of those products, is the site of a separate occurrence requiring imposition of another deductible.); *see also* Lee R. Russ and Thomas F. Segalla, *Couch on Insurance* § 220:26 (3d ed.1999) (recognizing that insured must absorb "the deductible

---

[7] Although "self-insured retention" is a term of art with a technically different meaning from the term "deductible," many cases and commentators use the terms interchangeably in the circumstances presented here. *See* Garret G. Gillespie, *The Allocation of Coverage Responsibility Among Multiple Triggered Commercial General Liability Policies in Environmental Cases: Life After Owens–Illinois*, 15 *Va. Envtl. L.J.* 525 (1995–96) (using the terms "deductible" and "self-insured retention" (SIRs) interchangeably).

for each occurrence where the deductible is tied to the policy limit") (citing to *N. States Power, supra* ); John T. Waldron, III, *Dial I for Insurance: Why the Mobile Phone Industry Should Call on Its Insurers to Cover Liabilities Arising from Radio Frequency Energy,* 35 *Tort & Ins. L.J.* 795, 805 (2000) (noting when several insurance policies are triggered under continuous-trigger theory, insurers are liable subject to any deductibles); Evan M. Goldenberg, *The Scope of Insurance Coverage for Pollution Claims in Florida: Full Indemnification for Indivisible Cleanup Costs Caused by Multiple Releases,* 24 *Nova L.Rev.* 373, 387–88 (1999) (citing Gillespie, *supra* ) (recognizing need to satisfy deductibles and SIR's in continuous-trigger setting). *But see Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.,* 210 *F.*3d 672, 690–91 (6th Cir.2000) (endorsing pro rata allocation of deductibles but failing to articulate rationale for so doing); *Lafarge Corp. v. Hartford Cas. Ins. Co.,* 61 *F.*3d 389 (5th Cir.1995) (endorsing pro-ration of deductibles because policies are ambiguous), *abrogation on other grounds recognized by, Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.,* 241 *F.*3d 396, 398 n. 3 (5th Cir.2001); *Nationwide Mut. Ins. Co. v. Lafarge Corp.,* 910 *F.Supp.* 1104, 1108 (D.Md.1996) (holding deductibles subject to pro-ration because of ambiguous policy language concerning apportionment of defense costs), *aff'd,* 121 *F.*3d 699 (4th Cir.1997).

## V

One final note. It is easy to understand why Benjamin Moore and CSR have conjured up a method of allocating deductibles that will provide them with more insurance coverage than any fair reading of *Owens–Illinois* would allow. They are after all, partisans with a financial stake in the outcome here. What is inexplicable is that the dissenters have adopted that method, untethered as it is, to any principled legal reasoning.

Indeed, the dissenters do not challenge, in any respect, our explication of *Owens–Illinois,* which clearly compels the outcome we have reached. They simply elide consideration of the "sepa-

rate occurrence" template we adopted in that case in favor of what is, for all intents and purposes the "single occurrence" modality that we there discredited. More tellingly, the dissenters never, even once, address *Owens–Illinois's* specific directive that policy "limits and exclusions" be honored. 138 *N.J.* at 476, 650 *A.2d* 974. Rather, they rely on their own personal notions of "enlightened public policy", "justice", and "fairness" in place of a coherent legal theory. Even that reliance is misplaced.

Insureds understand the relationship between premiums and deductibles. It plays out every day in auto insurance and home-owners' policies. Every insured is capable of obtaining first dollar coverage by paying an enhanced premium. Most opt for a lower premium in exchange for a deductible, recognizing that, as a result, losses will sometimes go uncovered. The dissenters would allow parties who knowingly chose a lower premium and a higher deductible to upend that bargain. Such an outcome does not advance justice, fairness, or enlightened public policy.

Justice does not guarantee insurance coverage in every case. It guarantees that the insurance bargain will be honored and that there will be an impartial resolution of conflicting claims based, not on whim or emotion, but on established legal principles. That notion of justice is not advanced by our dissenting colleagues' opinion.

## VI

In sum, the trial court and the Appellate Division correctly ruled that Benjamin Moore was required to satisfy the deductibles in the triggered policies under the *Owens–Illinois* allocation that we reaffirm today. The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, and WALLACE—5.

*For reversal*—Justices ZAZZALI and ALBIN—2.

Justice ALBIN, dissenting.

In the name of consistency, the Court interprets *Owens–Illinois, Inc. v. United Ins. Co.*, 138 *N.J.* 437, 650 *A.*2d 974 (1994), to reach not its inevitable, but its inequitable conclusion. The Court today holds that a policyholder who suffers property damage or personal injury as a result of a toxic environmental exposure occurring over a number of years must pay in full all deductibles for all of the triggered policies before he is entitled to any insurance coverage. That holding will come as a great surprise to many small business and property owners, who may find their assets completely depleted paying multiple deductibles before ever accessing the insurance for which they thought they had bargained. The written insurance contracts in this case do not speak to the issue and do not compel such a result. Nor does an enlightened public policy. This Court crafted the governing principle in *Owens–Illinois* to maximize insurance coverage when dealing with environmental damage and to further notions of simple justice. *Spaulding Composites Co., Inc. v. Aetna Casualty and Surety Co.*, 176 *N.J.* 25, 36, 819 *A.*2d 410 (2003) (citing *Owens–Illinois, Inc., supra*, 138 *N.J.* at 472–73, 650 *A.*2d 974). Because I believe the Court, though well intentioned, has taken a detour from those goals in this case, I must respectfully dissent.

In *Owens–Illinois,* we constructed a methodology to address the difficult issue of the allocation of insurance coverage among multiple policies in cases of progressive environmental injury or damage that runs a course of years from the toxic exposure to the manifestation of the injury or damage. We recognized that in such cases it would be an impossible task to quantify the extent of harm caused within any particular year. *Owens–Illinois, supra,* 138 *N.J.* at 466, 468, 650 *A.*2d 974. We, therefore, concluded that, as a matter of public policy, it was fair to "treat the progressive injury or damage as an occurrence within each of the years of a [comprehensive general liability] policy." *Id.* at 478, 650 *A.*2d 974. We allocated the coverage among the triggered policies from the time of exposure to manifestation of the injury or damage based

on the risk assumed by the carrier and its years on the risk, thereby proportionately spreading the costs of indemnification. *Id.* at 475, 650 *A.*2d 974. Accordingly, an insurance company, for each triggered policy year, would pay its *pro rata* share of the recovery costs. Our Court adopted that paradigm not because it flowed from the language of the insurance policies at issue, but because equity and notions of simple justice demanded that we do so. *Id.* at 471, 472–73, 650 *A.*2d 974.

With the *Owens–Illinois* methodology as an overlay to the insurance policies, the Court has decided that the remaining language of those policies must be honored, requiring that each deductible of each triggered policy first be exhausted before insurance coverage is reached. However, the policies do not address long-tail environmental contamination cases or the use of multiple deductibles in an *Owens–Illinois* paradigm. Because the insurance contracts do not reflect the reasonable expectations of the parties on that issue, this Court should be guided by the principle of equity to achieve substantial justice. Requiring each deductible to be exhausted in multiple insurance policies over a course of years before an insurance company is compelled to pony up even a dollar is not in keeping with the reasonable expectations of the parties and not mandated by our jurisprudence.

The unfairness of such a formula becomes evident when we envision its real-world application. Let us consider a small business owner who has had twenty years of coverage from comprehensive general liability policies in which the deductible in each year is $25,000 and the total insurance coverage for each year is $1,000,000. In the case of a business owner who suffers property damage or is sued for personal injury as a result of environmental contamination spanning the twenty policy years, the policyholder will not see a penny of insurance coverage if the costs related to the damage or injury are $500,000 or less because the policyholder must pay twenty years of deductibles. The Court's approach allows that inequitable result even though had the harm occurred in just one year covered by the policies, the business owner would

pay a deductible of only $25,000 and the insurance carrier would pay the remaining $475,000. Mandating the payment of multiple deductibles, as in the example given here, may lead to the bankrupting of the policyholder, who reasonably believed that to access $1,000,000 of coverage, he was required only to pay a $25,000 deductible. Simple justice suggests that those reasonable expectations should be fulfilled. I would follow the approach proposed by the *amici*, CSR Limited and Island Transportation Corporation, to achieve that equitable result.

Under the *amici* approach, the allocation between the policyholder's deductibles and the insurance coverage would be based on a joint and several and *pro rata* methodology. First, the policyholder must pay the number of deductibles necessary to yield the insurance coverage for the loss. Using the previous example as a template, if the policyholder suffered a loss in the amount of $2,500,000 as a result of an environmental contamination spanning twenty policy years, he would have to pay three deductibles to trigger the coverage of three policies to satisfy the loss. The first $25,000 deductible would release $975,000 of insurance, the second $25,000 deductible would release another $975,000 of insurance, and the last $25,000 deductible would release the remaining $475,000 necessary to satisfy the $2,500,000 loss. Thus, for each deductible paid under the policy, the maximum coverage limits of that policy are available. Second, the loss paid is then allocated among each of those twenty policies in proportion to the risk assumed. In my example, the policy coverage for each year was the same and accordingly the risk assumed was equal over the twenty policies. The insurance payout is calculated by subtracting the $75,000 deductible from the total loss of $2,500,000. The insurance payout of $2,425,000 is then divided equally over the twenty policies, requiring each policy to pay $121,250. The Court's methodology would require the policyholder to satisfy the twenty deductibles—$500,000—before triggering the insurance coverage. I am confident that the *amici* approach, although not as neat and simple to apply as the Court's, would further, rather than frustrate, the salutary goals of *Owens–Illinois*. It is true

that the Court's approach will protect policyholders in the event of a catastrophic loss. However, for those policyholders unable to pay the multiple deductibles before accessing insurance coverage, this Court's decision will be catastrophic. People and businesses buy insurance to protect against losses that might otherwise bankrupt them. The Court's decision denies the policyholder the very benefit that comes with the promise of insurance coverage.

The approach I suggest would not place the insurance industry at any serious disadvantage. Insurance carriers would adapt to the new reality by charging premiums and setting deductibles accordingly. Because this Court's decision will render illusory the insurance coverage policyholders thought they possessed and impoverish some of them before they receive the benefit of the insurance coverage they purchased, I must dissent.

Justice ZAZZALI joins in this dissent.