74 A.3d 860

FARMERS MUTUAL FIRE INSURANCE COMPANY OF SALEM, PLAINTIFF–APPELLANT, v. NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION AS ADMINISTRATOR OF CLAIMS AGAINST NEWARK INSURANCE COMPANY, DEFENDANT–RESPONDENT.

Argued January 2, 2013—Decided September 24, 2013.

524

*Fredric P. Gallin* argued the cause for appellant (*Methfessel & Werbel,* attorneys).

*Mark M. Tallmadge* argued the cause for respondent (*Bressler, Amery & Ross,* attorneys; *Mr. Tallmadge* and *Richard J. Teer,* on the briefs).

*Paul R. Duffy* on behalf of respondent State Farm Fire & Casualty Co. as subrogee of Welz joins in the brief submitted by appellant Farmers Mutual Fire Insurance Company of Salem (*Kearns & Duffy,* attorneys).

*Kevin T. Coughlin* submitted a brief on behalf of amicus curiae Zurich American Insurance Company (*Coughlin Duffy,* attorneys, *Mr. Coughlin, Lorraine M. Armenti, Christopher S. Franges,* and *Eduardo DeMarco,* of counsel and on the brief).

*Wendy L. Mager* and *Thomas E. Hastings* submitted a brief on behalf of amicus curiae The Complex Insurance Claims Litigation Association (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *Laura A. Foggan,* a member of the District of Columbia bar, of counsel).

Justice ALBIN delivered the opinion of the court.

This case involves the appropriate allocation of costs for the cleanup of environmental contamination of property when one of two insurance companies on the risk has become insolvent.

In *Owens–Illinois, Inc. v. United Insurance Co.*, we recognized the difficulty of determining the degree of harm caused by contamination within any particular year from the time of toxic exposure to manifestation. 138 *N.J.* 437, 457–59, 650 *A.*2d 974 (1994). We treated the progressive damage as an occurrence triggering the insurance policies in each of the intervening years. *Id.* at 478–79, 650 *A.*2d 974. We determined that the allocation of remediation costs among the policies is based on an insurance carrier's years on the risk and the degree of risk assumed as measured by the coverage provided. *Id.* at 479, 650 *A.*2d 974.

Here, in two consolidated cases involving remediation of contaminated properties, the New Jersey Property–Liability Insurance Guaranty Association (Guaranty Association) took over the administration of the claims of an insolvent insurance carrier on the risk pursuant to the New Jersey Property–Liability Insurance Guaranty Association Act (PLIGA Act or Act), *N.J.S.A.* 17:30A–1 to –20. The liable solvent insurance company paid the property-damage claims in each of the two cases and then sought reimbursement from the Guaranty Association under the *Owens–Illinois* methodology. The Guaranty Association claims that, pursuant to *N.J.S.A.* 17:30A–5 and –12b, it is not responsible for making any contribution until the policies of the solvent carrier are fully exhausted. The solvent carrier contends that the Guaranty Association must pay the share of the insolvent carrier in accordance with the *Owens–Illinois* allocation scheme. It contends that its position is consistent with the PLIGA Act.

The trial court agreed that the Guaranty Association is subject to the *Owens–Illinois* allocation methodology. The Appellate Division reversed, finding that *N.J.S.A.* 17:30A–5 expressly carves out an exception to *Owens–Illinois* and requires exhaustion of the

solvent carrier's policies before the Guaranty Association's reimbursement commitments are triggered.

We affirm. The *Owens–Illinois* methodology is a product of this Court's equitable powers to advance public policy within the realm of the common law. The purpose of the methodology is to make insurance coverage available, to the maximum extent possible, to redress such matters as toxic contamination of property. However, the Legislature has designated the Guaranty Association as an insurer of last resort when substituting for an insolvent carrier. *N.J.S.A.* 17:30A–5 and –12b specifically exempt the Guaranty Association from the *Owens–Illinois* allocation scheme until all solvent insurance companies' policy limits are exhausted. That statute also embodies an important public policy. The common law must bow when in conflict with a legislative scheme. A statute does not stand in an inferior status to the common law. Rather, a statute must be honored unless constitutionally infirm. Therefore, in accordance with the statutory scheme, the Guaranty Association is not responsible for reimbursement payments unless the solvent carrier's policy limits are first exhausted.

## I.

### A.

For three successive one-year periods, from August 29, 1999 to August 29, 2002, Newark Insurance Company (Newark), a subsidiary of Eagle Insurance Company, issued a homeowner's insurance policy covering the residential property of Edward and Carolyn O'Brien. Each policy provided coverage for damage to property, including damage caused by environmental contamination, to a maximum limit of $300,000. From August 29, 2002 to August 29, 2003, Farmers Mutual Fire Insurance Company of Salem (Farmers Mutual) insured the O'Brien property for damage to the maximum limit of $500,000. On March 19, 2003, soil and groundwater contamination caused by a fuel oil leak from an underground storage tank was discovered on the O'Brien proper-

ty. At that point, Farmers Mutual was less than seven months on the risk. No one disputes that the environmental contamination on the property began during the periods insured by Newark and continued through the period insured by Farmers Mutual. Farmers Mutual paid all remediation costs—$112,165.13—stemming from the contamination of the O'Brien property.

## B.

For four successive one-year periods, from December 13, 1998 to December 13, 2002, Newark issued insurance policies covering the property of Ramnath and Ashmin Sookoo. Each policy provided property damage coverage up to a maximum of $300,000. Farmers Mutual insured the Sookoos for property damage up to a maximum limit of $500,000 from December 13, 2002 to December 13, 2003. On August 19, 2003, soil and groundwater contamination caused by a fuel oil leak from an underground storage tank was discovered on the Sookoo property. At that point, Farmers Mutual was eight months on the risk. No one disputes that the environmental contamination on the property began during the periods insured by Newark and continued through the period insured by Farmers Mutual. Farmers Mutual paid all remediation costs—$25,958.39—stemming from the contamination of the Sookoo property.

## C.

In August 2007, the Chancery Division, Mercer County, declared Newark insolvent and entered an order liquidating the company. Afterwards, the Guaranty Association took over the administration of Newark's claims, pursuant to its statutory obligations under the PLIGA Act.

In February and March 2009, Farmers Mutual filed civil complaints in the Superior Court, Law Division, seeking reimbursement from the Guaranty Association for the remediation costs expended on the O'Brien and Sookoo properties. Farmers Mutual claimed that, in accordance with the allocation scheme adopted in

*Owens–Illinois,* the Guaranty Association was responsible for Newark's share of liability for the periods Newark insured the O'Brien and Sookoo properties. In contrast, the Guaranty Association denied that it had any responsibility to reimburse Farmers Mutual for the remediation costs.

The Guaranty Association moved for summary judgment, arguing that, pursuant to the PLIGA Act, the insureds (the O'Briens and the Sookoos) are required to exhaust their claims through solvent insurance companies before applying to the Guaranty Association for statutory benefits. Because no material facts were in dispute, the trial court determined that, as a matter of law, Farmers Mutual—not the Guaranty Association—was entitled to judgment in its favor. The court rejected the Guaranty Association's exhaustion argument and found that, under the Spill Compensation and Control Act (Spill Act), *N.J.S.A.* 58:10-23.11, Farmers Mutual had a right to contribution from the Guaranty Association for the remediation costs. The court also determined that the allocation of the remediation costs between Farmers Mutual and the Guaranty Association would be calculated at a future proceeding.

Based on the trial court's ruling, Farmers Mutual and the Guaranty Association agreed to the entry of a consent order allocating eighty-one percent of remediation costs ($90,854.24) for the O'Brien property to the Guaranty Association and eighty-four percent of remediation costs ($21,859.69) for the Sookoo property to the Guaranty Association. This agreement was reached with the understanding that the Guaranty Association would challenge on appeal the trial court's finding that the Guaranty Association was responsible for remediation costs in the two cases.

II.

The Appellate Division granted the Guaranty Association's motion to consolidate the O'Brien and Sookoo cases on appeal and, in an unpublished opinion, reversed the trial court. The Appellate Division concluded that a 2004 amendment to the PLIGA Act,

*N.J.S.A.* 17:30A–5, "requires the exhaustion of all insurance benefits from solvent insurers on the risk before [the Guaranty Association], standing in the shoes of an insolvent insurer, must pay statutory benefits." The panel noted that Farmers Mutual and the Guaranty Association both agreed that the trial court erred in finding that the Spill Act superseded the PLIGA Act.

The panel reviewed the *Owens–Illinois* allocation methodology, which was reaffirmed in *Carter–Wallace, Inc. v. Admiral Insurance Co.*, 154 *N.J.* 312, 712 *A.*2d 1116 (1998). From our jurisprudence, the panel distilled the principle that all carriers on the risk bear coverage obligations for environmental contamination from the time of commencement until manifestation.

With this common-law principle in mind, the panel turned to the PLIGA Act, which created the Guaranty Association as "a mechanism to deal with the consequences of an insolvent insurer...." The panel submitted "that the PLIGA Act was not designed to require [the Guaranty Association] to assume all the obligations of an insolvent insurer...." It construed the 2004 amendment to the PLIGA Act as requiring that claimants exhaust all rights against solvent insurers before seeking statutory benefits from the Guaranty Association. According to the panel, only after a solvent insurer on the risk has exhausted its policy limits to cover the liability is the Guaranty Association "required to disburse statutory benefits to protect the insured." Because Farmers Mutual did not exhaust its policy limits in either the O'Brien or Sookoo case, Farmers Mutual could not seek contribution from the Guaranty Association for the remediation costs expended cleaning up the contaminated properties.

Last, the panel emphasized that the PLIGA Act is remedial legislation intended "to protect insureds not insurers" and that "the Legislature's determination that an allocation of statutory benefits to policy periods covered by an insolvent insurer shall not occur until the limits of the solvent insurer are exhausted" is

entitled to deference. Accordingly, the panel reversed the trial court's order of summary judgment.[1]

This Court granted Farmers Mutual's petition for certification. 208 *N.J.* 600, 34 *A.*3d 781 (2011). We also granted the motions of The Complex Insurance Claims Litigation Association (CICLA) and Zurich American Insurance Company (Zurich) to participate as amici curiae.

## III.

### A.

Farmers Mutual argues that the Appellate Division in this case has effectively overruled the *Owens–Illinois* scheme by making solvent carriers "guarantors for the insolvent carrier." According to Farmers Mutual, if the Guaranty Association is not substituted for the insolvent Newark for purposes of the *Owens–Illinois* pro-rata allocation methodology, based on Newark's years on the risk and degree of risk assumed, then Farmers Mutual is compelled to cover one hundred percent of the risk for years not covered by the policies it issued. Farmers Mutual contends that "the solvent carrier's coverage [is not] applicable to any of the years insured by the insolvent carrier," citing *Spaulding Composites Co., Inc. v. Aetna Casualty & Surety Co.*, 176 *N.J.* 25, 42–45, 819 *A.*2d 410 (2003), *cert. denied*, 540 *U.S.* 1142, 124 *S.Ct.* 1061, 157 *L.Ed.*2d 953 (2004). It reasons, based on a reading of *Quincy Mutual Fire Insurance Co. v. Borough of Bellmawr*, 172 *N.J.* 409, 437, 799 *A.*2d 499 (2002), that its coverage liability is limited "to the several months it insured the [O'Brien and Sookoo properties] which, by stipulation is less than 20%." It maintains that the 2004 PLIGA amendment, *N.J.S.A.* 17:30A–5, should be construed in accordance with the allocation methodology set forth in *Owens–Illinois.*[2]

---

[1] Farmers Mutual also argued that the 2004 amendment to the PLIGA Act was a violation of the Contracts Clauses of the United States and New Jersey Constitutions. The Appellate Division, however, did not address that issue.

[2] Farmers Mutual seizes on language from *Spaulding Composites, supra,* 176 *N.J.* at 36, 819 *A.*2d 410, and *Benjamin Moore & Co. v. Aetna Casualty & Surety*

Last, Farmers Mutual posits that a reading of the 2004 amendment that would alter the *Owens–Illinois* allocation scheme and overrule *Sayre v. Insurance Co. of North America*, 305 *N.J.Super.* 209, 701 *A.*2d 1311 (App.Div.1997)—on which it claims to have relied—would render the retroactive application of the amendment unconstitutional.[3]

Amicus curiae CICLA repeats many of the same arguments advanced by Farmers Mutual. CICLA argues that the Appellate Division, by ignoring "settled New Jersey law about allocation of long tail loss," failed "to hold [the Guaranty Association] responsible for its allocable share of the loss" and compelled Farmers Mutual to pay for a loss that did not occur during its policy period. The result, CICLA contends, is contrary to the contractual terms between Farmers Mutual and its insureds and to the "plain language" of the 2004 amendment to the PLIGA Act. In its view, the panel's reading of the amendment overthrows "well-entrenched New Jersey allocation law" and renders the law an "unconstitutional impairment of existing contract rights."

Amicus curiae Zurich takes the view that the 2004 amendment does not alter the *Owens–Illinois* formula because "the insured, and not its other insurers, remains responsible for periods where its insurer becomes insolvent." Thus, according to Zurich, although the PLIGA Act established a fund allowing an insured to

---

*Co.*, 179 *N.J.* 87, 101, 843 *A.*2d 1094 (2004), in which we stated that a policyholder is not relieved of financial liability as a result of its insurer's insolvency. Neither one of those cases involved the PLIGA Act or mentioned the Guaranty Association's statutory obligation to stand in the shoes of the insurer to protect the insured on certain claims up to a maximum of $300,000.

[3] Although Farmers Mutual contends that the 2004 amendment is ex post facto legislation, its claim in essence is that the amendment is an impairment of its preexisting contract and therefore violates the Contracts Clauses of the Federal and State Constitutions. "The Ex Post Facto Clause was intended to interdict the retroactive application of criminal laws that harm the accused." *State v. Fortin*, 178 *N.J.* 540, 608, 843 *A.*2d 974 (2004) (citing *Miller v. Florida*, 482 *U.S.* 423, 430, 107 *S.Ct.* 2446, 2451, 96 *L.Ed.*2d 351, 359–60 (1987); *State v. T.P.M.*, 189 *N.J.Super.* 360, 366–67, 460 *A.*2d 167 (App.Div.1983)).

recover at least a portion of a loss covered by an insolvent insurer, the Act does not control how losses are allocated between an insurer and its insured. From Zurich's standpoint, even if the Guaranty Association is correct that the 2004 amendment prevents an insured from recovering statutory benefits before the policies of the solvent insurers are exhausted, the insured bears the loss for the period the insolvent carrier was on the risk. In short, Zurich would place the insured on the hook and not remove "the insolvent period from the *Owens–Illinois* calculations."

### B.

The Guaranty Association contends that although the 2004 amendment to the PLIGA Act does not scuttle the *Owens–Illinois* allocation methodology, it does require that "the periods of insolvent coverage will be disregarded until such time as the solvent coverage is exhausted." The Guaranty Association maintains that, through the 2004 amendment, the Legislature intended "to modify the role of the Guaranty Association in the context of the *Owens–Illinois* allocation scheme" by effectively rendering the Association as "a payor of last resort." It submits that, in a long-tail environmental contamination case, the Guaranty Association is not compelled to pay statutory benefits until all solvent insurance coverage is exhausted.

The Guaranty Association notes that this Court did not expect its decision in *Owens–Illinois* to be the " 'last word' " on the subject of allocation of loss in the area of "environmental liability insurance law," quoting *Owens–Illinois, supra,* 138 *N.J.* at 478, 650 *A.*2d 974. The Guaranty Association stresses that the Legislature is authorized to direct public policy and that the *Owens–Illinois* allocation methodology, devised by this Court through its common-law powers, is not "sacrosanct." It also posits that "this Court must assume that the Legislature was aware of the Court's decisions in *Owens–Illinois* and *Sayre* when it enacted the relevant statutory amendment[ ] [*N.J.S.A.* 17:30A–5] in 2004."

The Guaranty Association points out that under the PLIGA Act insureds remain protected because once solvent insurers' policies are exhausted, "the claimant may seek payment of statutory benefits from the Guaranty Association for amounts remaining unpaid, subject to the statutory cap." Moreover, according to the Guaranty Association, solvent carriers are not without a remedy for they "may seek recovery from the liquidator of an insolvent insurer for amounts which have been paid as a result of the insolvency." The Guaranty Association also notes that its resources are limited and must be conserved for the payment of covered claims.

The Guaranty Association rejects the argument that the 2004 amendment constitutes an unconstitutional ex post facto law. In its view, the amendment does not alter the insurance coverage provided by Farmers Mutual to its insureds—that is, Farmers Mutual does not have to pay claims falling outside of its policies or make payments beyond its policy limits. The Guaranty Association also emphasizes that Farmers Mutual could not consider the allocation scheme inviolable because it is "scientifically impossible" to determine when the environmental damage occurred and therefore no assumption can be made "that the allocation scheme accurately defines the damage that actually occurred in any particular time period."

## IV.

The material facts in the two appeals before us are not in dispute. The questions presented in Farmers Mutual's petition for certification involve solely issues of law.

In construing the meaning of a statute or our case law, our review is de novo, and therefore we owe no deference to the trial court's or Appellate Division's legal conclusions. *Murray v. Plainfield Rescue Squad*, 210 *N.J.* 581, 584, 46 *A*.3d 1262 (2012) (citing *Manalapan Realty, L.P. v. Twp. Comm.*, 140 *N.J.* 366, 378, 658 *A*.2d 1230 (1995) ("A trial court's interpretation of the law and

the legal consequences that flow from established facts are not entitled to any special deference.")).

"Our paramount goal in interpreting a statute is to give effect to the Legislature's intent." *Wilson ex rel. Manzano v. City of Jersey City*, 209 *N.J.* 558, 572, 39 *A.*3d 177 (2012) (citation omitted). In doing so, we first look to "the statute's plain language, ascribing to the words used 'their ordinary meaning and significance.'" *Murray, supra,* 210 *N.J.* at 592, 46 *A.*3d 1262 (quoting *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005)). If the statutory language is clear and unambiguous, and reveals the Legislature's intent, we need look no further. *Ibid.* (citations omitted). Only when the meaning of a statute is not self-evident on its face—when it is subject to varying plausible interpretations, or the strict application of the words will lead to an absurd result or one at odds with public policy or "an overall statutory scheme"—do we turn to extrinsic sources, such as legislative history. *Id.* at 592, 46 *A.*3d 1262 (citing *DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.*2d 1039). Importantly, in carrying out our interpretive task, we "must be guided by the legislative objectives sought to be achieved by enacting the statute." *Wilson, supra,* 209 *N.J.* at 572, 39 *A.*3d 177 (citing *LaFage v. Jani,* 166 *N.J.* 412, 431, 766 *A.*2d 1066 (2001)).

This case largely turns on the impact of a 2004 PLIGA Act amendment on our common-law jurisprudence, which sets forth a methodology for allocating liability among insurance companies in long-tail environmental contamination matters. We thus begin with a brief review of *Owens–Illinois* and its progeny.

## V.

### A.

In the ordinary personal-injury or property-damage case, an "occurrence" is usually an event, fixed in time, that triggers coverage under an insurance policy. On the other hand, environmental contamination and toxic exposure cases, by their nature,

occur over time, gradually or progressively causing personal injury or property damage that overlaps successive insurance policy periods. *See Owens–Illinois, supra,* 138 *N.J.* at 454–59, 650 *A.*2d 974; *Carter–Wallace, supra,* 154 *N.J.* at 321, 712 *A.*2d 1116. The inability of science to pinpoint the onset and to measure the extent of environmental injury or damage over a continuum in time required a paradigm different from the approach in the traditional property-damage case. *See Benjamin Moore, supra,* 179 *N.J.* at 90–91, 843 *A.*2d 1094.

■ In *Owens–Illinois, supra,* we adopted a methodology— known as the continuous-trigger doctrine—for allocating insurance liability among multiple insurers and insureds from the time a person or property is exposed to toxic contamination to manifestation of injury or damage. 138 *N.J.* at 478–79, 650 *A.*2d 974. Under this doctrine, injury or damage occurring during each phase of environmental contamination, from exposure to manifestation, is deemed an "occurrence" that triggers every insurance policy on the risk. *Id.* at 450–51, 650 *A.*2d 974 (citing *Uniroyal, Inc. v. Home Ins. Co.,* 707 *F.Supp.* 1368, 1387 (E.D.N.Y.1988)). In other words, "courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL [comprehensive general liability insurance] policy." *Id.* at 478–79, 650 *A.*2d 974. In choosing this approach, we recognized that the common law must adapt to the particular circumstances of environmental-damage-claim cases. *Id.* at 458–59, 650 *A.*2d 974.

Acknowledging that the standard comprehensive general liability policies implicated in *Owens–Illinois* did not answer the problem of allocation of remediation costs, we turned to a common-law solution. *Id.* at 459–67, 650 *A.*2d 974. We rejected a joint-and-several allocation in favor of a proration scheme, believing this approach would maximize the availability of insurance coverage in environmental contamination cases. *Id.* at 472–73, 478–79, 650 *A.*2d 974. This approach "allocate[s] the losses among the carriers on the basis of the extent of the risk assumed, i.e., proration on the basis of policy limits, multiplied by years of coverage." *Id.*

at 475, 650 *A*.2d 974 (citation omitted). Thus, the measure of an insurance company's allocable share depends on both "the time on the risk and the degree of risk assumed." *Id.* at 479, 650 *A*.2d 974.

Last, we determined that a person or entity that is insured for some periods but chooses not to be insured for others is liable for those uninsured periods. *Ibid.*

### B.

In *Owens–Illinois,* we did "not attempt a universal resolution of all issues of coverage for gradual release of pollutants or toxins." *Id.* at 474, 650 *A*.2d 974. We also observed that we did " 'not expect that this case will be the "last word" ' " on the subject, noting that " '[e]nvironmental liability insurance law, like any other area of law, will have to develop over time and trial courts must be flexible in responding to new fact situations.' " *Id.* at 478, 650 *A*.2d 974 (quoting *N. States Power Co. v. Fid. & Cas. Co. of N.Y.,* 523 *N.W.*2d 657, 665 (Minn.1994)). In the years since, in case after case, we have consistently reaffirmed the principles animating *Owens–Illinois,* adapting them to new circumstances. *See Benjamin Moore, supra,* 179 *N.J.* at 91, 101, 843 *A*.2d 1094 (holding that deductibles in each triggered policy must be paid before insured can access insurance funds under *Owens–Illinois* allocation scheme); *Spaulding Composites, supra,* 176 *N.J.* at 28, 43–44, 819 *A*.2d 410 (holding that "non-cumulation" clauses in insurance policies are inconsistent with and unenforceable under *Owens–Illinois* 's continuous-trigger and pro-rata allocation doctrines); *Quincy Mut. Fire Ins. Co., supra,* 172 *N.J.* at 437, 799 *A*.2d 499 (holding that "*Owens–Illinois* allocation formula should reflect days rather than years on the risk when the underlying facts require that degree of precision in the allocation of liability"); *Carter–Wallace, supra,* 154 *N.J.* at 321, 325–28, 712 *A*.2d 1116 (holding that losses must be vertically allocated to triggered primary and excess policies under *Owens–Illinois* allocation scheme in "progressive environmental property damage" cases).

In all of those cases, we adjusted and refined the common-law continuous-trigger and proration doctrines enunciated in *Owens–Illinois*.

## C.

The case most similar to the one before us is *Sayre, supra*, 305 *N.J.Super.* 209, 701 *A*.2d 1311, which addressed allocation of loss when one of several insurers becomes insolvent in a progressive environmental injury/damage case involving the continuous-trigger doctrine. More particularly, *Sayre* dealt with the intersection of *Owens–Illinois* and the New Jersey Surplus Lines Insurance Guaranty Fund Act (Guaranty Fund Act), *N.J.S.A.* 17:22–6.70 to – 6.83, which provides statutory benefits—not to exceed $300,000, *N.J.S.A.* 17:22–6.74a(1)—to insureds whose carriers are insolvent.[4] *Sayre, supra*, 305 *N.J.Super.* at 211, 701 *A*.2d 1311.

In that case, the plaintiffs were the successors-in-interest to a company whose former manufacturing plant was the site of environmental contamination and cleanup. *Id.* at 211–12, 701 *A*.2d 1311. Because of the contamination and remediation, claims were filed, and the plaintiffs sought recovery from insurance carriers under polices issued over an eleven-year period. *Id.* at 212, 701 *A*.2d 1311. The Commissioner of Insurance directed the Guaranty Fund to respond to the claims filed with the insolvent carrier. *Ibid.* Under the then Guaranty Fund Act, persons making a claim against the Fund had to first "exhaust their 'right[s]' under any other solvent insurance policy against which they [had] a claim." *Id.* at 212–13, 701 *A*.2d 1311 (quoting *N.J.S.A.* 17:22–6.79b). The

---

4 The Guaranty Fund Act and PLIGA Act both establish entities that take the place of certain insolvent insurers in responding to covered claims. *Compare N.J.S.A.* 17:22–6.74a(1)-(2), *with N.J.S.A.* 17:30A–8a(1)-(2). Under the Guaranty Fund Act, the Guaranty Fund membership is composed of surplus line insurers. *N.J.S.A.* 17:22–6.73. Under the PLIGA Act, the Guaranty Association explicitly excludes from membership surplus line insurers. *N.J.S.A.* 17:30A–5 (defining "member insurer" and "insolvent insurer"); *see also R.R. Roofing & Bldg. Supply Co. v. Fin. Fire & Cas. Co.,* 85 *N.J.* 384, 392–93, 427 *A*.2d 66 (1981).

Appellate Division rejected the Fund's argument that "the allocation method used in *Owens–Illinois* should be employed first to exhaust all other insurance coverage provided by the solvent carriers on the risk." *Id.* at 213, 701 *A.*2d 1311. The Appellate Division determined that "the Fund [was] required to pay the share which would have been allocated to the [insolvent carrier's] policy, not exceeding the statutory $300,000 limit." *Id.* at 214, 701 *A.*2d 1311 (citing *N.J.S.A.* 17:22–6.74a(1)). It concluded that *Owens–Illinois* did not suggest "that it would be fair or proper to burden the solvent carriers" with exposure for years that they were not on the risk. *Id.* at 215, 701 *A.*2d 1311.

In the case before us, the Appellate Division held that the 2004 amendment to the PLIGA Act superseded the *Sayre* decision in continuous-trigger environmental-contamination cases and that the policy limits of solvent carriers must be exhausted before benefits can be accessed from the Guaranty Association. We therefore turn to the PLIGA Act.

## VI.

### A.

Among the reasons that individuals and entities purchase insurance is protection from risks that might cause financial loss—even catastrophic loss. When insurance companies are rendered insolvent, insureds no longer have the protection for which they contracted and claimants no longer have a source from which to be made whole for their losses. To mitigate the financial distress to insureds and claimants caused by an insurance company's insolvency, the Legislature passed the New Jersey Property–Liability Insurance Guaranty Association Act, *N.J.S.A.* 17:30A–1 to –20. *See* Senate Bill Statement, S. 1004, c. 17 (April 11, 1974), *quoted in Carpenter Tech. Corp. v. Admiral Ins. Co.*, 172 *N.J.* 504, 514, 800 *A.*2d 54 (2002) (noting that PLIGA Act's purpose is to " 'avoid financial loss to claimants or policyholders because of the insolvency of insurance companies' "); *Am. Employers' Ins. Co. v. Elf*

*Atochem N. Am., Inc.,* 157 *N.J.* 580, 586, 725 *A.*2d 1093 (1999) (finding that PLIGA Act passed "to protect against the possible insolvency of insurance companies doing business in New Jersey").

■ The PLIGA Act created the Guaranty Association—a private, "nonprofit, unincorporated association whose members consist of insurance companies licensed to issue certain types of insurance policies in New Jersey," including property insurance. *Elf Atochem, supra,* 157 *N.J.* at 586–87, 725 *A.*2d 1093; *N.J.S.A.* 17:30A–6; *see also N.J.S.A.* 17:30A–5 (defining "member insurer"). The Guaranty Association is "empowered to assess members in amounts necessary to pay the covered claims of an insolvent insurer." *R.R. Roofing, supra,* 85 *N.J.* at 390, 427 *A.*2d 66 (citing *N.J.S.A.* 17:30A–8); *N.J.S.A.* 17:30A–8a(3). The assessments are recouped by insurance carriers, which pass them on to insureds as a policy premium surcharge. *R.R. Roofing, supra,* 85 *N.J.* at 390 n. 4, 427 *A.*2d 66 (citing *N.J.A.C.* 11:1–6.1); *N.J.S.A.* 17:30A–16a.

■ The Guaranty Association is obligated to stand in the place of "an insolvent insurer and to pay certain claims up to the limit of the policyholder's contract, subject to a maximum liability of $300,000." *Carpenter, supra,* 172 *N.J.* at 508, 800 *A.*2d 54 (summarizing *N.J.S.A.* 17:30A–8a(1)–(2)); *see also Elf Atochem, supra,* 157 *N.J.* at 584, 725 *A.*2d 1093. The Guaranty Association's responsibility to pay insolvent insurers' covered claims is not without limit, *Thomsen v. Mercer–Charles,* 187 *N.J.* 197, 205, 901 *A.*2d 303 (2006); its resources must be conserved to achieve the Act's core purposes, *Elf Atochem, supra,* 157 *N.J.* at 590–91, 725 *A.*2d 1093.[5] Accordingly, caution must be exercised "in the payment of claims." *Carpenter, supra,* 172 *N.J.* at 515, 800 *A.*2d 54.

---

[5] For example, the Guaranty Association will "not pay prejudgment interest on covered claims[,] *N.J.S.A.* 17:30A–5d"; "counsel fees incurred by a successful party in a declaratory judgment coverage action against [the Guaranty Association,] *N.J.S.A.* 17:30A–5d"; "or unpaid claims that are" asserted by non-resident

## B.

The conservation of the Guaranty Association's resources is an objective of the PLIGA Act. That objective is clear from *N.J.S.A.* 17:30A–12b, which requires that, when a claim arises under policies issued by both a solvent and insolvent insurer, the claimant must first exhaust the policy of the solvent insurer. *N.J.S.A.* 17:30A–12b ("Any person having a claim ... under an insurance policy other than a policy of an insolvent insurer, shall be required to *exhaust first* his right under that other policy.") (emphasis added); *see also Carpenter, supra,* 172 *N.J.* at 516, 800 *A.*2d 54.

The exhaustion language of *N.J.S.A.* 17:30A–12b of the PLIGA Act is identical to the exhaustion language of *N.J.S.A.* 17:22–6.79b of the Guaranty Fund Act, construed in *Sayre.* If there were no statutory language defining exhaustion, which was true at the time of the *Sayre* decision, the ruling in *Sayre* might have resonance in this case. However, in 2004, the Legislature added an amendment to both the PLIGA Act and the Guaranty Fund Act defining the word "exhaust" in continuous-trigger cases involving progressive injury and property damage.

The amendment to *N.J.S.A.* 17:30A–5 added the definition of exhaust to the PLIGA Act which governs this case:

"Exhaust" means with respect to other insurance, the application of a credit for the maximum limit under the policy, except that in any case in which continuous indivisible injury or property damage occurs over a period of years as a result of exposure to injurious conditions, exhaustion shall be deemed to have occurred only after a credit for the maximum limits under all other coverages, primary and excess, if applicable, issued in all other years has been applied. . . .

[*L.* 2004, *c.* 175, § 2 (effective Dec. 22, 2004).]

The identical language appears in the definition of "exhaust" that appears in the 2004 amendment to the Guaranty Fund Act. *N.J.S.A.* 17:22–6.72; *L.* 2004, *c.* 165, § 2 (effective Dec. 7, 2004). There can be no doubt that these statutes, which repeat almost

---

insureds or claimants that do not "concern property permanently located in New Jersey. *N.J.S.A.* 17:30A–5." *Carpenter, supra,* 172 *N.J.* at 516, 800 *A.*2d 54.

verbatim the language of *Owens–Illinois, supra,* are referring to the continuous trigger-doctrine. *See* 138 *N.J.* at 478–79, 650 *A.*2d 974 ("[W]hen progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy.").

The most straightforward, plain reading of *N.J.S.A.* 17:30A–5 is that the term "if applicable" modifies "other coverages" and that "other coverages" is merely a shorthand reference to policies issued by solvent insurers. Thus, when one of several insurance carriers on the risk is insolvent in a continuous-trigger case, then the limits of the policies issued by solvent insurers "in all other years" must first be exhausted before the Guaranty Association is obligated to pay statutory benefits. In other words, if there are no solvent carriers on the risk "in all other years," *N.J.S.A.* 17:30A–5 is not "applicable" because then there are no "other coverages, primary and excess" to be exhausted. Certainly, the exhaustion provision would serve no purpose if only an insolvent carrier were on the risk.

Farmers Mutual urges that we construe the words "if applicable" to mean "other coverages" issued in the same year that the insolvent insurer issued a policy. That reading would render *N.J.S.A.* 17:30A–5 virtually meaningless and require us to ignore that the Act is addressing cases involving "continuous indivisible injury or property damage occur[ring] over a period of years." Farmers Mutual's main argument is that the Legislature could not have intended the 2004 amendment to the PLIGA Act to scuttle the *Owens–Illinois* allocation formula by requiring a solvent carrier to pick up the costs in a year insured by an insolvent carrier. Farmers Mutual insists that even if the Legislature intended that result, *Owens–Illinois* expresses an inviolable principle that cannot be altered even by statute.

The Legislature is presumed to be aware of the decisional law of this State. *Yanow v. Seven Oaks Park, Inc.,* 11 *N.J.* 341,

350, 94 *A*.2d 482 (1953) (noting that courts presume Legislature is "familiar not only with the statutory law of the State, but also with the common law") (citing *Ross v. Miller*, 115 *N.J.L.* 61, 63, 178 *A.* 771 (Sup.Ct.1935)). If the Legislature were content with the *Sayre* decision—a continuous-trigger case—in which the Guaranty Fund was required to step into the shoes of the insolvent carrier for proration purposes, there would have been little point to adding the 2004 amendments, *N.J.S.A.* 17:30A–5 and *N.J.S.A.* 17:22–6.72, defining exhaustion in cases of "continuous indivisible injury or property damage occur[ring] over a period of years as a result of exposure to injurious conditions." It is reasonable to conclude based on the statutory language that the Legislature intended to reverse the result in *Sayre.* It is not reasonable to conclude that the Legislature employed the language "if applicable" to render its own provision meaningless, as Farmers Mutual posits, by suggesting that the strict application of *Owens–Illinois* is sacrosanct and beyond legislative correction. This argument is inconsistent with the principle that the Guaranty Association is an insurer of last resort. *See Carpenter, supra,* 172 *N.J.* at 530, 800 *A.*2d 54 (citing Kent M. Forney, *Insurer Insolvencies and Guaranty Associations,* 43 *Drake L.Rev.* 813, 825 (1995)).

In addition, we do not accept amicus curiae Zurich's position that, for the years in which the Guaranty Association is standing in the place of an insolvent carrier in a long-tail environmental contamination case, the insured—not the solvent insurer—is compelled to make payments under the *Owens–Illinois* allocation scheme before accessing statutory benefits under the PLIGA Act. That interpretation of *N.J.S.A.* 17:30A–5 would turn the PLIGA Act on its head. The PLIGA Act created the Guaranty Association as a means of providing benefits to insureds who, through no fault of their own, have lost coverage due to the insolvency of their carriers. *N.J.S.A.* 17:30A–4 directs us to "liberally construe[ ]" the Act to achieve its purposes. One of those purposes is "to minimize financial loss to claimants or policyholders because of the insolvency of an insurer." *N.J.S.A.* 17:30A–2. That aim would be defeated by making the insured bear the loss for the carrier's

insolvency before the insured received any statutory benefits from the Guaranty Association.

## C.

 We reject Farmers Mutual suggestion that the common-law proration scheme enunciated in *Owens–Illinois* takes precedence over the 2004 amendment to the PLIGA Act. The common law is the collection of judicially crafted principles—developed in the crucible of the adversarial process—that govern matters that do not fall within the realm occupied by the Legislature. Legislation has primacy over areas formerly within the domain of the common law. Legislation reflects the will of the people as enacted through their elected representatives. Only the Constitution—our organic charter—is paramount to legislative enactments. *See United States v. Schooner Peggy*, 5 *U.S.* (1 *Cranch*) 103, 110, 2 *L.Ed.* 49, 51 (1801) (Marshall, C.J.) (noting that when "a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional . . . I know of no court which can contest its obligation."). Legislative enactments are never subservient to the common law when the two are in conflict with each other.[6] The saying "equity follows the law" is a recognition that the common law must bow to statutory law. *See* Letter from Thomas Jefferson to Phillip Mazzei (Nov. 1785), *in* 4 *The Works of Thomas Jefferson* 473, 476 (Paul Leicester Ford ed., 1904) (noting that a court of equity "cannot interpose in any case against the express letter and intention of the legislature"). Any other notion is inconsistent with the most basic principles of our democratic form of government.

---

6 "While it is the settled rule that a statute in derogation of the common law must be strictly construed, it is axiomatic that this rule will not be permitted to defeat the obvious purpose of the legislature, or lessen the scope plainly intended to be given to the measure." *Ross, supra*, 115 *N.J.L.* at 64, 178 *A.* 771 (citing *Jamison v. Encarnacion*, 281 *U.S.* 635, 50 *S.Ct.* 440, 74 *L.Ed.* 1082 (1930)).

■ The PLIGA Act, no less than *Owens–Illinois*, is an expression of public policy. The PLIGA Act makes clear that "[a]ll laws and parts of laws of this State inconsistent with this act are hereby deemed superseded to the extent of such inconsistency." *N.J.S.A.* 17:30A–4b. The definition of "exhaust" in *N.J.S.A.* 17:30A–5 as applied to *N.J.S.A.* 17:30A–12b is clearly intended to make the Guaranty Association the insurer of last resort in triggered years in long-tail environmental contamination cases. Under the statute, in long-tail cases such as these, insureds are required to exhaust the limits of the policies issued by solvent insurers before applying to the Guaranty Association for statutory benefits. The clarity of the statutory language is consonant with the objectives of the PLIGA Act, one of which is to ensure that the limited resources of the Guaranty Association are available to mitigate the financial distress caused to insureds and claimants when an insurance carrier becomes insolvent.

## VII.

■ Last, we reject Farmers Mutual's argument that the 2004 amendment to the PLIGA Act impairs its pre-existing contractual rights in violation of our Federal and State Constitutions. *See U.S. Const.* art. 1 § 10, cl. 1 ("No State shall ... pass any ... Law impairing the Obligation of Contracts...."); *N.J. Const.* art. IV, § 7, ¶ 3 ("The Legislature shall not pass any ... law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made."). The issue is whether the exhaustion definition of *N.J.S.A.* 17:30A–5 as applied to *N.J.S.A.* 17:30A–12b unconstitutionally impairs Farmers Mutual's contractual rights. Our analysis here is limited to an industry that is highly regulated by the State.

■ Legislation unconstitutionally impairs a contract when it (1) "substantially impair[s] a contractual relationship," (2) "lack[s] a significant and legitimate public purpose," and (3) is "based upon unreasonable conditions and ... unrelated to appropriate governmental objectives." *State Farm Mut. Auto. Ins. Co. v. State,* 124

*N.J.* 32, 64, 590 *A.2d* 191 (1991) (citing *Energy Reserves Grp., Inc. v. The Kansas Power & Light Co.,* 459 *U.S.* 400, 411–12, 103 *S.Ct.* 697, 704–05, 74 *L.Ed.2d* 569, 580–81 (1983)). It has been recognized that the Contracts Clause must be applied flexibly. *Ibid.* (citing *Allied Structural Steel Co. v. Spannaus,* 438 *U.S.* 234, 240, 98 *S.Ct.* 2716, 2720, 57 *L.Ed.2d* 727, 733–34 (1978)).

In a highly regulated industry, such as insurance, businesses have no "contractual expectation" that a naturally fluid regulatory scheme, "subject to change at any time," will remain in an unalterably fixed state. *State Farm Mut. Auto. Ins. Co., supra,* 124 *N.J.* at 64–65, 590 *A.2d* 191. Indeed, when evaluating whether contractual rights have been "substantially impaired" by legislation, courts routinely consider whether the parties should have anticipated changes in the governing law in a regulated industry. *See Energy Reserves Grp., Inc., supra,* 459 *U.S.* at 411, 103 *S.Ct.* at 704, 74 *L.Ed.2d* at 580–81 (citing *Allied Structural Steel Co., supra,* 438 *U.S.* at 242 n. 13, 98 *S.Ct.* at 2721 n. 13, 57 *L.Ed.2d* at 735 n. 13) ("In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past.").

Insurance carriers have been on notice that in long-tail, continuous-trigger cases involving indivisible injury *Owens–Illinois* would not be "the 'last word.'" 138 *N.J.* at 478, 650 *A.2d* 974 (citation omitted). As such, the application of the *Owens–Illinois* allocation scheme has been a work in progress from the very beginning.

Until today, we have not had occasion to speak to the intersection of the PLIGA Act and the allocation scheme in long-tail environmental contamination cases. Farmers Mutual assumes that the 2004 amendment was something other than a clarification of the PLIGA Act's earlier exhaustion provision. The 2004 amendment left no doubt that the Guaranty Association was the insurer of last resort in long-tail cases. The way Farmers Mutual envisioned the *Owens–Illinois* allocation would work in the present case when it contracted with its insureds did not vest it with a right to the outcome it wanted.

Moreover, Farmers Mutual has not been required to pay beyond the maximum policy limits that it insured in each of the two cases. The risk it assumed in issuing those policies is that it would be liable for environmental damage not to exceed $500,000 while it was on the risk. The 2004 amendment does not upset that contractual assumption.

We decline to hold that allocating cleanup costs to Farmers Mutual in accordance with the 2004 PLIGA Act amendment has impaired its rights under the Contracts Clause. Farmers Mutual has not shown that the 2004 PLIGA Act amendment has caused a "substantial impairment" of its contractual rights under the first prong of the *State Farm* test. Moreover, Farmers Mutual falls short on the second and third prongs as well. Specifically, Farmers Mutual cannot prevail because the PLIGA Act—inclusive of the 2004 amendment—is motivated by "significant and legitimate" public policy goals and imposes "[ ]reasonable conditions" related to "appropriate governmental objectives." *State Farm, supra,* 124 *N.J.* at 64–65, 590 *A.*2d 191 (citations omitted).

The PLIGA Act is intended "to minimize financial loss to claimants or policyholders because of the insolvency of a property or casualty insurer." Senate Commerce Comm., *Statement to Senate Comm. Substitute for Senate Nos. 702 & 1580* (May 17, 2004). The creation of the Guaranty Association was a reasonable policy choice to achieve this important governmental objective. The Legislature intended the Guaranty Association to serve as a payor of last resort, understanding that the Guaranty Association's resources are limited and must be conserved to best achieve the goal of the PLIGA Act. The exhaustion requirement, which mandates that solvent carriers pay the maximum limits of their policies before insureds may seek statutory benefits from the Guaranty Association, clearly does not "lack a significant and legitimate public purpose" and is not "unrelated to appropriate governmental objectives."

We cannot conclude that the 2004 PLIGA Act unconstitutionally impairs Farmers Mutual's contracts with its insureds.

## VIII.

In long-tail, continuous-trigger cases where an insolvent carrier is on the risk along with solvent carriers, an insured must first exhaust the policy limits of the solvent carriers before seeking statutory benefits from the Guaranty Association. That result is mandated by the PLIGA Act's exhaustion provision. For the reasons expressed in this opinion, we affirm the judgment of the Appellate Division. As a matter of law, the Guaranty Association is entitled to summary judgment in its favor. Accordingly, Farmers Mutual's complaint seeking reimbursement from the Guaranty Association is dismissed.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned)—7.

*Opposed*—None.